MARTIN CASSIDY, Respondent, *v.* FREDERICK UHLMANN, Appellant, Impleaded with Others.

1. BANKING.  The relations to each other of a bank, its depositors, stockholders and directors generally, stated and discussed.

2. DIRECTOR'S LIABILITY TO DEPOSITORS FOR FRAUD IN CONTINUING BUSINESS OF THE BANK WITH KNOWLEDGE OF ITS INSOLVENCY.  The duty of a bank director who, after a careful investigation by himself and another director, has absolute knowledge that the bank is hopelessly insolvent, is to initiate such measures, so far as it lies within his power, as will result in the closing of the bank for business; if he fails so to do and by not objecting acquiesces and thus takes part in any arrangement which permits the bank to be kept open and the receipt of deposits under any conditions except a full and fair disclosure of its condition, he is personally liable on the ground of fraud for damages to a depositor who is ignorant of the bank's insolvency and whose deposits were thereafter received; and this is so although, upon discovering the insolvency, he expresses the opinion that deposits ought not thereafter to be received, and the arrangement for receiving deposits was a qualified one for a specified purpose under proper restrictions and was directed by a codirector, especially in a

case where he neglects to see that it is carried out and it is subsequently abandoned and deposits are received thereafter, in the usual manner.

3. DUTY OF DIRECTOR UPON DISCOVERY OF INSOLVENCY. While the question as to what measures a director ought to take under such circumstances cannot be categorically answered, yet in such a case, which is not that of a passive and ignorant director confused by a sudden emergency, but is rather that of one whose voluntary activity and assumption of power discloses a condition which forbids a continuance of the business of the bank, he should call a meeting of the board of directors or communicate with the superintendent of the banking department or instruct the cashier to discontinue the taking of deposits until some other official action can be taken, or warn individual depositors of the bank's insolvency, and if all else failed, as a last resort, he should make public announcement of the insolvency.

4. EVIDENCE — BURDEN OF PROOF. While the burden of proof as to fraud in an action based thereon is upon the plaintiff, yet when a *prima facie* case of fraud has been made out, the burden of explanation is thrown upon the defendant.

5. ACTION AGAINST DELINQUENT DIRECTOR — SUFFICIENCY OF EVIDENCE. The evidence in an action against a bank director for damages for fraud and deceit in permitting the receipt of deposits after the insolvency of the bank was known to him without a disclosure of its condition, examined and held sufficient to establish defendant's knowledge that the bank was insolvent at the time the deposits were received, and that he took part in directing their receipt, knowing that the bank was insolvent.

6. EVIDENCE — RES GESTÆ — MOTIVE. In such an action evidence that checks were drawn at a meeting held after the bank had closed and suspended payment and at which defendant was present, in favor of a corporation of which he was president, of a corporation of which his brother was an officer and in favor of the state treasurer, between whom and the officers of the bank close relations existed; that such checks were paid by the bank's clearing house agent and were for a larger amount than the visible assets of the bank at the time its hopeless insolvency became definitely known to him several days prior to the time of its suspension is admissible as part of the *res gestæ*, or at least the evidence is admissible as bearing upon the motive or intent with which the director took part in keeping open the bank during such time for the receipt of deposits.

*Cassidy* v. *Uhlmann*, 54 App. Div. 205, affirmed.

(Argued January 20, 1902; decided April 8, 1902.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered

November 17, 1900, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*William A. Jenner* and *Oscar W. Jeffery* for appellant. Defendant Uhlmann stood in no contractual or personal relation to plaintiff's assignors. His situation was that of an unpaid agent of the bank, having no powers outside of the board of which he was a member. (*Bank* v. *Millard,* 10 Wall. 115; *Marine Bank* v. *Fulton Bank,* 2 Wall. 252; *Thompson* v. *Riggs,* 5 Wall. 663; *Charitable Corp.* v. *Sutton,* 2 Atk. 400; *Spering's Appeal,* 71 Penn. St. 11; *Scott* v. *Depeyster,* 1 Edw. Ch. 513; *O. & G. Co.* v. *Gibb,* L. R. [5 H. of L.] 480; *Hun* v. *Cary,* 82 N. Y. 65; *Holmes* v. *Willard,* 125 N. Y. 79; *O'Brien* v. *Fitzgerald,* 143 N. Y. 377.) The plaintiff failed to prove, as alleged, that defendant Uhlmann alone, or with Blaut and McDonald, was a "committee" in charge and control of the bank on August seventh and eighth. (*Arthur* v. *Griswold,* 55 N. Y. 400; *Cragie* v. *Hadley,* 99 N. Y. 131; *Threfal* v. *Giles,* 2 M. & R. 492; *Sadler* v. *Belcher,* 2 M. & R. 489; *S. L. & S. F. R. R. Co.* v. *Johnston,* 27 Fed. Rep. 243; *Chaffee* v. *Fort,* 2 Lans. 81; *Hun* v. *Cary,* 58 How. Pr. 426; *Austin* v. *Daniels,* 4 Den. 299; *Cargill* v. *Bower,* L. R. [10 Ch. Div.] 502; *Smith* v. *Rathbun,* 60 Barb. 409.) Defendant Uhlmann, as director, had no power *virtute officii* to close the bank or stop taking deposits. (*Chaffee* v. *Fort,* 2 Lans. 81; *F. F. Ins. Co.* v. *Jenkins,* 3 Wend. 130; *Sanderson* v. *Tinkham,* 49 N. W. Rep. 1034; *C. Bank* v. *Gospel,* 127 N. Y. 361; *Duke* v. *Markham,* 10 S. E. Rep. 1017; *Butterick* v. *N., etc., R. R. Co.,* 62 N. H. 413; *State* v. *People,* 42 Ohio St. 579; *N. H., etc., Co.* v. *Childs,* 52 N. W. Rep. 600.) Defendant Uhlmann was not required to disclose to depositors that the bank was in a critical condition, or even that it was insolvent, if he knew it. (*Quin* v. *Earle,* 95 Fed. Rep. 728; *S. L. & S. F. R. R. Co.*

v. *Johnston,* 27 Fed. Rep. 243 ; *Reddington* v. *Roberts,* 25 Vt.
686 ; *Patton* v. *Campbell,* 70 Ill. 72 ; *Smith* v. *Smith,* 21
Penn. St. 367 ; *Nichols* v. *Pinner,* 18 N. Y. 295 ; *Sheldon*
v. *Clews,* 13 Abb. [N. C.] 40 ; *Hotchkin* v. *T. Nat. Bank,*
127 N. Y. 329 ; *Rothmiller* v. *Stein,* 143 N. Y. 581.)
Defendant Uhlmann is not liable for constructive fraud.
(*Cargill* v. *Bower,* L. R. [10 Ch. Div.] 502 ; *Weir* v. *Bell,*
L. R. [3 Exch.] 238 ; *Kountze* v. *Kennedy,* 147 N. Y. 124 ;
*Hadock* v. *Osmer,* 153 N. Y. 604 ; *Sheldon* v. *Clews,* 13
Abb. [N. C.] 40.) There was no evidence that the defendant
Uhlmann knew on August seventh and eighth that the bank
was insolvent. (*Higgins* v. *Worthington,* 12 App. Div. ·361 ;
*People* v. *St. N. Bank,* 77 Hun, 159 ; *Truman* v. *Lombard,*
10 App. Div. 430.) A director is not liable for mere errors
of judgment in the absence of fraudulent intent. (*Chaffee* v.
*Fort,* 2 Lans. 81 ; *Spering's Appeal,* 71 Penn. St. 11 ; *Mar-
shall* v. *M. S. Bank,* 85 Va. 676.) The action is not to hold
defendant Uhlmann liable for damages arising out of negli-
gent loans or investments made by the bank, and, therefore,
evidence relating to such were not pertinent to the allega-
tions of fraud. (*Movius* v. *Lee,* 30 Fed. Rep. 298 ; *Briggs*
v. *Spaulding,* 141 U. S. 132 ; *Clews* v. *Bardon,* 36
Fed. Rep. 617 ; *Scott* v. *Depeyster,* 1 Edw. Ch. 513.)
The refusal of the trial court to dismiss the complaint was.
error. (*Cassidy* v. *Uhlmann,* 163 N. Y. 380 ; *Arthur* v.
*Griswold,* 55 N. Y. 406 ; *State* v. *Warner,* 55 Pac. Rep. 342 ;
*Anon.,* 67 N. Y. 598 ; *Cragie* v. *Hadley,* 99 N. Y. 131.) The
books of the bank were not evidence against defendant with-
out proof that he had had knowledge of them and the entries
therein. (*Rudd* v. *Robinson,* 126 N. Y. 113 ; *Powell* v.
*Conover,* 75 Hun, 11.) The trial court erred in permitting
Morton, the bank's clerk, to testify respecting the East River
Bridge Company's check for $50,000, the state treasurer's
check for $250,000 and the Glen Ridge Quarry Company's
check for $5,000. (*O'Brien* v. *E. R. B. Co.,* 161 N. Y. 539 ; ·
*Waldele* v. *N. Y. C. & H. R. R. R. Co.,* 95 N. Y. 274 ;
*Tilson* v. *Terwilliger,* 56 N. Y. 273 ; *Eighmy* v. *People,* 79

N. Y. 546; *People* v. *Davis,* 56 N. Y. 95; *Insurance Co.* v. *Moslay,* 8 Wall. 397.)

*Harold Nathan* for respondent. It is a fraud for the officers of a bank to permit a deposit when they know that the bank is insolvent. (14 Am. & Eng. Ency. of Law [2d ed.], 81; *R. P. Co.* v. *Loomis,* 45 Hun, 93; *Cragie* v. *Hadley,* 99 N. Y. 131; *Atkinson* v. *R. P. Co.,* 114 N. Y. 168; *I., etc., Bank* v. *Peters,* 123 N. Y. 272; *Grant* v. *Walsh,* 145 N. Y. 502; *N. Y. B. Co.* v. *Higgins,* 79 Hun, 250; *Higgins* v. *Worthington,* 12 App. Div. 361; *S. B. C. Co.* v. *Dunn,* 39 App. Div. 130; *St. L., etc., Ry. Co.* v. *Johnston,* 133 U. S. 566; 27 Fed. Rep. 243; *Richardson* v. *Olivier,* 105 Fed. Rep. 277.) The fact that a bank keeps its doors open and transacts business is a continuing assertion of its solvency. (*Rochester P. Co.* v. *Loomis,* 45 Hun, 93; 120 N. Y. 659; *N. Y. B. Co.* v. *Higgins,* 79 Hun, 250; *Higgins* v. *Worthington,* 12 App. Div. 361; *Baker* v. *State,* 54 Wis. 368; *Meadowcroft* v. *People,* 163 Ill. 56; *Dryer* v. *Pease,* 88 Fed. Rep. 978; Zane on Banking, 128.) A bank director who actively participates in keeping the bank open for the receipt of deposits, when he knows that the bank is insolvent, participates in a fraud upon the depositors, for which he may be held personally liable. (3 Thomp. on Corp. §§ 4091, 4096; *Phillips* v. *Wortendyke,* 31 Hun, 192; *Williams* v. *Wood,* 14 Wend. 126; *Allen* v. *Addington,* 7 Wend. 10; *Shaw* v. *Stine,* 8 Bosw. 157; *Hadcock* v. *Osmer,* 4 App. Div. 435; 153 N. Y. 604; *Morse* v. *Swits,* 19 How. Pr. 275; *Bruff* v. *Mali,* 36 N. Y. 200; *Barnes* v. *Brown,* 80 N. Y. 527; *Salmon* v. *Richardson,* 30 Conn. 360; *Bartholomew* v. *Bentley,* 15 Ohio, 659.) Defendant Uhlmann violated his duty to the depositors. (*R. P. Co.* v. *Loomis,* 45 Hun, 93; *McClure* v. *Law,* 161 N. Y. 78; *Prout* v. *Chisholm,* 21 App. Div. 56; *Bosworth* v. *Allen,* 168 N. Y. 157; 3 Thomp. on Corp. § 4020; *W. I. Co.* v. *Extension Co.,* 129 U. S. 643; *Cooper* v. *Hill,* 36 C. C. A. 402; 94 Fed. Rep. 582; *Warren* v. *Robinson,* 57 Pac. Rep. 287; *United Soc.* v. *Under-*

*wood,* 9 Bush. 609 ; *Gerner* v. *Mosher,* 58 Neb. 135 ; *Gillet* v. *Phillips,* 13 N. Y. 114 ; *Cutting* v. *Marloe,* 78 N. Y. 454 ; *Dreyer* v. *Pease,* 88 Fed. Rep. 978 ; *Gibbons* v. *Anderson,* 80 Fed. Rep. 345 ; *Maisch* v. *S. Fund,* 5 Phil. 30.) Defendant Uhlmann became a trustee with respect to deposits received after knowledge of the bank's insolvency. (*Richardson* v. *N. O., etc., Co.,* 102 Fed. Rep. 785 ; *Atkinson* v. *R. P. Co.,* 114 N. Y. 168 ; *United Soc.* v. *Underwood,* 9 Bush. 609 ; *Miller* v. *Howard,* 95 Tenn. 407 ; *Matter of N. R. Bank,* 60 Hun, 91 ; *Klepper* v. *Cox,* 37 S. W. Rep. 284 ; *State* v. *Eifert,* 102 Iowa, 188.) It was clearly proved that defendant Uhlmann knew of the insolvency of the bank prior to August 7, 1893, and that, notwithstanding such knowledge, he took part in keeping the bank open for the receipt of deposits. (*Sickels* v. *Herold,* 149 N. Y. 332 ; *Bailey* v. *Hornthal,* 89 Hun, 514 ; *Higgins* v. *Worthington,* 12 App. Div. 361 ; *Ferry* v. *Bank of Central New York,* 15 How. Pr. 445 ; *Dodge* v. *Mastin,* 5 McCrary, 404 ; *Com.* v. *Hazlett,* 14 Penn. St. 352 ; *State* v. *Tomblin,* 57 Kan. 841 ; *State* v. *Cadwallader,* 154 Ind. 607 ; *Martin* v. *Webb,* 110 U. S. 7 ; *Scale* v. *Baker,* 70 Tex. 283.) The violation of the statute, section 601 of the Penal Code, was evidence of the wrongful nature of defendant's conduct. ( *Willy* v. *Mulledy,* 78 N. Y. 310 ; *Stay* v. *Du Bois,* 74 Hun, 135 ; *Pitcher* v. *Lennon,* 12 App. Div. 356 ; *Mallory* v. *N. Y. R. E. Assn.,* 13 Misc. Rep. 496 ; *Pauley* v. *S. G. & L. Co.,* 131 N. Y. 90 ; *Knisley* v. *Pratt,* 148 N. Y. 378 ; *Foley* v. *Phelps,* 1 App. Div. 551 ; *T. & S. Bank* v. *Mfg. Co.,* 150 Ill. 336 ; *Baker* v. *State,* 54 Wis. 368 ; *State* v. *Shove,* 96 Wis. 1.) This court cannot weigh the evidence. (*Nat. Bank of Deposit* v. *Rogers,* 166 N. Y. 380 ; *Castleman* v. *Mayer,* 168 N. Y. 354 ; *Townsend* v. *Bell,* 167 N. Y. 462 ; *People ex rel.* v. *Barker,* 165 N. Y. 305 ; *Jerome* v. *Q. C. C. Co.,* 163 N. Y. 351.) No errors were committed in the rulings on evidence. (*Blake* v. *Griswold,* 103 N. Y. 429 ; *Bedford* v. *Sherman,* 68 Hun, 317 ; *Rudd* v. *Robinson,* 126 N. Y. 113 ; *Huntington* v. *Attrill,* 118 N. Y. 365 ; *Cragie* v. *Hadley,* 99 N. Y. 131 ;

*Townsend* v. *Felthousen*, 156 N. Y. 618.) The trial court did not err in permitting Morton to testify respecting the checks of the East River Bridge Company, the state treasurer and the Glen Ridge Quarry Company. (*Cassidy* v. *Uhlmann*, 163 N. Y. 380; Taylor on Ev. § 588; *Townsend* v. *Felthousen*, 156 N. Y. 618; *People* v. *Peckens*, 153 N. Y. 576; *Dunham* v. *Townshend*, 118 N. Y. 281 ; *Dunford* v. *Weaver*, 84 N. Y. 445.)

WERNER, J. The plaintiff, as assignee of the claims of several depositors in the Madison Square Bank, brought this action against the president and two directors thereof to recover damages for their alleged fraud and deceit in directing and permitting said bank to remain open for the transaction of its regular business after it had become hopelessly insolvent, and in directing and permitting said bank to receive the deposits made by plaintiff's assignors while said bank was in said insolvent condition and with full knowledge thereof. The complaint charges, in substance, that the Madison Square Bank was a moneyed corporation organized under the laws of this state, and prior to August, 1893, engaged in the banking business in the city of New York; that on the 7th and 8th of August, 1893, the plaintiff's assignors deposited certain moneys with said bank; that it was then hopelessly insolvent and permanently closed its doors at the end of banking hours on the 8th day of August, 1893 ; that the defendant Blaut as president of said bank, and the defendants McDonald and Uhlmann as directors thereof, constituting a committee having the charge, management, direction and actual control of said bank and having knowledge of its insolvency, did direct the same to be kept open for the regular transaction of its business for the purpose of inducing depositors to deposit moneys therein, and with that purpose and intention did represent to the depositors of said bank that it was solvent and could properly and lawfully accept deposits ; that said representations were false ; that while said bank was insolvent it received the moneys of the plaintiff's assignors ; that this was done

with the consent, direction, procurement and instigation of said defendants who wrongfully concealed from said depositors the actual condition of said bank to their damage to the extent of their said deposits, less the dividends paid to apply thereon by the receiver of said bank. Service of the summons herein was never made upon said Blaut, the president of said bank. McDonald, although served, died before the trial of the action, and it has not been revived as against his personal representatives. The appellant Uhlmann is, therefore, the sole defendant. He presented no evidence.

The evidence given in support of the allegations of the complaint is substantially as follows: At the expiration of banking hours on Tuesday, August 8th, 1893, the Madison Square Bank closed its doors, never to open them again. It was then hopelessly insolvent and had been so during several days prior to the 7th and 8th days of August when the deposits upon which plaintiff's claim is based were made. On the evening of August 2nd, Blaut, the president of the bank, McDonald and Uhlmann, two of its directors, Thompson, cashier and director, and Morton, its bookkeeper, met in the banking house. Blaut, McDonald and Uhlmann were in the president's room, or the cashier's department. At intervals they called in Morton, the bookkeeper, who gave them figures and statements from the books as to the assets and liabilities of the bank. On the evening of Friday, August 4th, the appellant Uhlmann, McDonald, his co-director, Putney, the latter's lawyer, Thompson, the cashier, and Morton, the bookkeeper, were again in the banking house. Morton was at work upon a statement of the bank's assets and liabilities which was not complete. He showed it to Uhlmann and had some conversation with him about it. On Saturday morning, August 5th, between 9:30 and 10:00 o'clock, McDonald and Uhlmann were again at the banking house. Morton showed the completed statement of the bank's assets and liabilities to Uhlmann and had some talk with him about it. After the latter had examined it, he threw his pencil upon the table and exclaimed "the surplus is gone — the capital begins to

walk off — by gosh, the bank is busted." Uhlmann was at the banking house again that afternoon. In the evening he was there with McDonald and Thompson. At the latter meeting there was some discussion as to the advisability of receiving deposits on the following Monday. McDonald and Uhlmann both stated that it would not be right to receive deposits in the then condition of the bank. McDonald asked Thompson what could be done about it. Then the former told the latter to receive deposits on Monday under the following plan, viz.: "If a person owed the bank any money, and the amount that he owed the bank was in excess of his deposit then standing to his credit, the amount should be entered upon his pass book. If it was less, he was to be given a duplicate deposit ticket and his book held. In case the depositor did not owe the bank, a duplicate deposit ticket was to be given him and his book held on any pretext — for balancing or whatever it might be." This method of receiving deposits was followed on Monday until some time in the afternoon, "when word was received from down town to put the deposits through." Until this message was received the deposits taken in were laid aside, but after that all deposits, including those received under said arrangement, were entered upon the books as assets of the bank. On Monday evening, August 7th, there was a meeting at the banking house. There were present Blaut, the president, who had not been there since the preceding Wednesday ; Soulard, McDonald and Uhlmann, directors; Thompson, cashier and director; Mr. Jenner, counsel for Uhlmann ; Messrs. Putney and Twombly, counsel for McDonald. On Tuesday, August 8th, the bank was opened at the usual hour and deposits were received in the regular way. This was continued throughout the day. At the close of banking hours the bank shut its doors forever. At six o'clock that evening there was a meeting at the banking house. There were present Blaut, the president; Thompson, cashier and director; Uhlmann, McDonald, Ottenberg, Kalisher and Soulard, directors, and a committee of the clearing house. Later in the evening the

state treasurer entered the banking house and was admitted to the private room where a conference was going on. On Wednesday morning, August 9th, it transpired that after the close of banking hours on the previous day checks had been drawn in favor of said state treasurer for $250,000.00; in favor of the East River Bridge Co., of which the defendant was president, for $50,000.00, and in favor of the Glen Ridge Mining and Quarry Co., a corporation of which Simon Uhlmann, the defendant's brother, was an officer, for $5,000.00 against the deposits for these amounts, respectively, standing to their credit, and these checks were paid by the St. Nicholas Bank, the clearing house agent of the Madison Square Bank.

There was evidence to the effect that the defendant had not been in the habit of visiting the banking house in the evening at any time prior to August 2d, 1893. There was no evidence showing that any meeting of the directors of the Madison Square Bank was held or called at any time between the 2d and 9th days of August, 1893; or that any attempt was made to hold or call such meeting. It did not appear who sent word to the bank on Monday " to put the deposits through."

Upon this evidence the court submitted to the jury two questions: 1st. Did the defendant know, at the time the deposits in question were taken by the bank, that the bank was insolvent? 2d. Did the defendant take part in directing the receipt of the deposits by the bank knowing that it was insolvent? Both of these questions were answered in the affirmative, and a general verdict was rendered in favor of the plaintiff for $6,496.86.

As the Appellate Division has affirmed the judgment entered upon this verdict every fact found which has the support of any evidence is conclusive upon this court. (*Nat. Bank of Deposit* v. *Rogers*, 166 N. Y. 380; *Castleman* v. *Mayer*, 168 N. Y. 354; *Townsend* v. *Bell*, 167 N. Y. 462.) The facts thus found are (1) that the deposits, under which the plaintiff claims, were made in the Madison Square Bank on the 7th and 8th days of August, 1893; (2) that said bank was

then insolvent; (3) that the defendant, then a director of said bank, had knowledge of such insolvency; (4) that the defendant, with knowledge of such insolvency, took part in directing the receipt of deposits by said bank. In its final analysis, therefore, the case resolves itself into the question whether, upon the facts established, the legal conclusion of defendant's liability follows.

The theory upon which the action was brought, and upon which the defendant has been held liable in the courts below, is that by taking part in directing the receipt of deposits by said bank, knowing that it was insolvent, the defendant was guilty of a fraud by which the plaintiff's assignors were damaged and which gave them, or their assignee, a cause of action. This charge of fraud is predicated not alone upon the ordinary duties with which the defendant was charged by virtue of his office as a director of the bank, but upon those duties in connection with others, which he is said to have voluntarily assumed by his course of conduct during the last days of the bank. It is evident that we can arrive at no just conclusion upon the questions involved in the action without an approximately correct understanding of the relations, to each other, of the parties interested in the controversy.

The ordinary relation between a bank and its depositors is that of debtor and creditor. (*Cragie* v. *Hadley,* 99 N. Y. 133; *Commercial Bank* v. *Hughes,* 17 Wend. 94; *Met. Nat. Bank* v. *Loyd,* 90 N. Y. 530; *Ætna Nat. Bank* v. *Fourth Nat. Bank,* 46 N. Y. 86; *Crawford* v. *West Side Bank,* 100 N. Y. 53; *Fowler* v. *Bowery Savings Bank,* 113 N. Y. 453.) This is because cash when deposited ceases to be the money of the depositor and becomes the property of the bank. A different rule obtains, however, when by reason of fraud or insolvency, the title to the deposited money does not pass. In such a case the bank becomes a trustee *ex maleficio* and, of course, the relation of trustee and *cestui que trust* is created. (*Atkinson* v. *Rochester Printing Co.,* 114 N. Y. 168.) So far as creditors are concerned the relation between a bank and its directors is that of principal and agent.

(*Briggs* v. *Spaulding*, 141 U. S. 132.) There is also a qualified trust relation between the directors of a bank and its stockholders on the one hand, and between such directors and the bank's creditors on the other. Since the affairs of a bank are necessarily subject to the exclusive control of its directors, the acceptance of the office of director carries with it the implied and inherent obligation to perform the duties thereof in such a way as to promote the best interests of the stockholders. (*Duncomb* v. *N. Y., H. & N. R. R. Co.*, 84 N. Y. 199; *Cumberland Coal and Iron Co.* v. *Parish*, 42 Md. 599.) So long as a bank is solvent and continues its business in the regular and proper way, its directors are neither agents nor trustees of the creditors. But when a bank is insolvent its directors, who continue to serve as such, become trustees for the creditors, because they are the custodians of the bank's assets, which constitute a trust fund for the payment of its debts. (*Beach* v. *Miller*, 130 Ill. 162; *Haywood* v. *Lincoln Lumber Co.*, 64 Wis. 639; *Richards* v. *N. H. Ins. Co.*, 43 N. H. 263.) An incorporated bank must, of course, be conducted through the intervention of duly authorized officers and agents. The board of directors of a bank has the general superintendence and active management of all its concerns, and, for all practical purposes, the board is the corporation. As a general rule a board of directors must act as a board. But, since directors do not exercise a delegated authority in the sense which applies to other officers and agents, it is clear that a board of directors may delegate some of its powers to committees and individuals selected from the board. This is common practice in the management of banks as well as other corporations. Since a board of bank directors is composed of individuals it is manifest that each director sustains a distinct relation, not only to his bank, but to its stockholders and depositors. For obvious reasons the duties which attach to this relation cannot be precisely defined. They cannot be the same under all circumstances; nor can they be imposed with unvarying exactness upon all directors alike. Again, applying a general rule,

bank directors are bound to administer the affairs of a bank according to the terms of its charter, in good faith and with reasonable care and diligence. (*First Nat. Bank* v. *Ocean Nat. Bank*, 60 N. Y. 278.) Those who deal with a bank have the right to expect reasonable diligence and good faith at the hands of its directors. If the latter fail in either, they violate a duty which they owe to both stockholders and depositors. Justice and public policy require that when one voluntarily takes the position of bank director he should exercise at least the same degree of care that men of common prudence exercise in their own affairs. (*Hun* v. *Cary*, 82 N. Y. 65.)

In the light of the foregoing general observations let us now look at the situation presented by this record, to ascertain the duties and liabilities, if any, of the defendant towards the plaintiff's assignors. Of the history of the Madison Square Bank which antedated the second day of August, 1893, we know nothing except that the defendant was a member of its board of directors and that it had not been his custom to visit the bank outside of banking hours. Beginning with the latter date we find him at the banking house on that evening, on Friday evening, August 4th, on Saturday evening, August 5th, on Monday evening, August 7th, and on Tuesday evening, August 8th. His conduct, and the unfortunate termination of the bank's history on the latter date, clearly point to the purpose of these visits. It was undoubtedly to obtain definite proofs of facts relating to the bank's condition, which must have been brought to his attention in some way and at some time prior to August 2nd, 1893. His worst fears were realized. On August 5th, 1893, he knew beyond peradventure that the bank was insolvent. This was not an accidental discovery of doubtful import, but the accurate result of a careful and systematic investigation. The later judicial determination of this bank's utter insolvency was but an echo of the defendant's declaration of August 5th, "the surplus is gone — the capital begins to walk off — the bank is busted." Who were the defendant's associates during the week of investigation

which preceded this declaration? McDonald, a co-director, and Thompson, co-director and cashier. The remainder of the eleven who constituted the board of directors were not present, nor does their presence seem to have been considered indispensable, for the record is silent as to whether any attempts were made to secure any meetings of the board during that week. On Friday evening, August 4th, the defendant's co-director McDonald, was attended by his counsel, while Morton and the defendant were discussing the statement of the bank's affairs which the former was preparing at the request of the latter. On the next morning, or at any rate during the next day, the completed statement was shown the defendant, and his expression, above quoted, clearly demonstrates how well founded were the fears which led the defendant into the investigation. " The bank is busted." Is anything to be done? To the man of ordinary prudence, actuated by honest motives, such an emergency would suggest that something ought to be done, and that quickly. What more natural than that a meeting of the board of directors should be held, or at least called? But the record is barren of any suggestion of that kind. On the contrary, the self-constituted triumvirate consisting of the defendant, McDonald and Thompson, hold another evening meeting. Although we have here a bank governed, as defendant now contends, by a board of eleven directors, these three meet to discuss and decide the question whether the bank shall open for business on Monday morning, whether deposits shall be received and, if so, under what conditions. They finally decide that the bank shall open and that deposits shall be received in the manner above set forth. Was this done because it was impossible to procure a meeting of the board of directors? We do not know, for the record is silent upon that subject. Was it because there was hope of extricating this bank from its difficulties? Evidently not, for it is conceded that there was no substantial change in its condition between Saturday night and Tuesday afternoon when it closed its doors, hopelessly insolvent. A private banker who continues to take deposits under such circum-

stances is clearly guilty of fraud.. (*Anonymous*, 67 N. Y.
599.) The same rule applies against a corporate bank. (*Cragie
v. Hadley*, 99 N. Y. 131.) Counsel for the defendant, while
conceding the soundness of the rule referred to, contends that
it has no application to the case at bar. As the defendant
was neither a private banker nor a corporate bank, it must be
admitted that it does not apply unless the acts of the defend-
ant supply the analogy to make it applicable. It is urged on
defendant's behalf: 1st. That the affirmation of solvency
implied in keeping the bank open for the receipt of deposits
was the affirmation of the bank and not of the defendant.
2nd. That since a corporate bank can only act through its
board of directors, as a board, the defendant's acts were with-
out power and that there can be no duty where there is no
power. 3rd. That defendant did nothing as a result of which
the bank was kept open or the receipt of deposits was con-
tinued. It is true that, primarily, the affirmation of the bank's
solvency implied in keeping it open for the receipt of deposits,
was the act of the bank. It is equally true that a corporate
bank usually acts through its board of directors. We think
it is not true that the fraud in this transaction was the fraud
of the bank alone; nor can we admit the soundness of the
argument that the defendant had neither power nor duty in
the premises. Power and duty, even when strictly correla-
tive, are never exact and unvarying unless they arise out of
fixed, clearly defined and unchanging conditions. Such con-
ditions rarely exist in any phase of commercial activity. This
is particularly true of banking. The executive officers of cor-
porate banks are necessarily vested with large discretionary
powers. In delegating some of its powers to others, a board
of directors does not abdicate its other functions, nor do the
individual members of the board become mere automatons,
bereft of the power of speech and action, except when the
mechanism of the board is set in motion. There are many
emergencies which call for individual action by directors,
although no formal authority has been conferred. If a bank
director should discover a fire in his banking house he would

not wait for a formal meeting of the board of directors to authorize him to make an attempt to extinguish the fire or to call out the fire department. If a theft of the bank's money should be attempted in the presence of a single director, under such circumstances that his prompt interference would easily prevent its consummation, no one would seriously question that director's power and duty in the premises, because the charter and by-laws of the bank contained no provision to meet such an emergency. If, in such a case, a director should try to do his obvious duty and fail, he would of course incur no liability. But suppose he should actually participate with a bank officer, of superior or equal grade, in starting the fire or committing the theft, could there be an utter absence of duty and liability, simply because there was an apparent lack of formal power? In the case at bar the defendant felt called upon to make an investigation of the bank's condition. We will assume that this may have been done with the best of motives. The investigation was pursued to the point where defendant was confronted with indubitable proofs of the bank's ruin. This was not later than Saturday night and probably was as early as Saturday morning, August 5th. He was then chargeable with knowledge that any attempt of the bank to continue business under such conditions would be a fraud upon those who continued to deal with it in ignorance thereof. His appreciation of this fact is attested by his suggestion that it would not be right to continue taking deposits in view of the condition of the bank. When McDonald suggested that deposits be received in the qualified way above referred to, there was no intimation from the defendant that the absence of a quorum of the board rendered all action impossible. When the direction was given to continue the taking of deposits the defendant gave no sign that he objected to the cashier's receiving orders from a single director. There was no dissent, no objection, and this, we think, was equivalent to acquiescence. It is to be remembered that the defendant was not a mere director, actually ignorant of the real state of affairs and hastily called into an impromptu conference. For

nearly a week he had been in daily and almost constant inter-
course with the men who were present on that Saturday even-
ing.    Between them they had pursued such a systematic
investigation of the bank's condition as would ordinarily be
undertaken only at the instance of the board of directors.
The president of the bank had not been at the banking house
since the previous Wednesday.   Somebody was managing
that bank.   Was it the president, or the board of directors,
or the cashier in conjunction with his co-directors, the defend-
ant and McDonald ?   The events of that week furnish a
convincing answer to these inquiries.   " But," asks the
defendant's counsel, " what particular thing was the defend-
ant called upon to do ? "   As we have already intimated, the
question cannot be answered categorically.   At first sugges-
tion it seems so direct and plausible as to raise serious doubts
whether there is anything that the defendant could or ought
to have done.   But upon second thought the true situa-
tion presents itself.   This is not the case of a passive and
ignorant director, confused by a sudden emergency, but rather
that of one whose voluntary activity and assumption of power
disclosed a condition which forbade the continuance of the
corporate business.   This disclosure was made on Saturday
after several days of investigation, during which the official
head of the bank had been conspicuous by his absence.   The
ruin was complete.   Under the circumstances above referred
to this was known to the defendant, unless we clothe the office
of bank director with a sacred and unique immunity from all
intelligence and knowledge.   In these conditions there were
several things that the defendant could have done.   He could
have called a meeting of the board of directors.   He could
have communicated with the superintendent of the banking
department between Saturday and Monday.   He could have
instructed the cashier to discontinue the taking of deposits
until some other official action could have been taken.   He
could quietly have warned individual depositors that no fur-
ther deposits would be received until further notice.   He
could have publicly announced that the bank would be

closed pending official investigation. These suggestions will, of course, meet with a variety of answers. It is said that we do not know whether the defendant called a meeting of the board of directors or communicated with the banking department. That is true; but we would know if the defendant had told the court what he knew upon the subject. "But," says the defendant, "this is an action based upon fraud, and as fraud is never presumed it must be proved." Again we assent, but with this qualification: When a *prima facie* case of fraud has been made out, the burden of explanation is thrown upon the defendant. Then, again, it is suggested that if the defendant had instructed the cashier to discontinue the receipt of deposits it might have been of no avail, for the cashier was at least the official equal of the defendant and subject to no orders except from the board of directors. It may be true that the cashier was under no obligation to obey an individual director. But he had done so. He had yielded such obedience in coming to the bank in the evenings, in making, or having made, tabulated statements of the bank's finances, and was about to obey McDonald in continuing the taking of deposits under the arrangement suggested by him. In the light of these facts it is not difficult to understand that the cashier would not have dared to disobey a direction so obviously proper and honest. With reference to the suggestion that the defendant might have warned individual depositors of the bank's insolvency, or, if all else failed, have announced it publicly, defendant's counsel argues that no reasonable rule of law places upon a director such a duty and responsibility. To the extent that this observation applies to bank directors generally we concur in it. We cannot admit its application to the case of this defendant. It may be assumed that no man of ordinary intelligence and prudence would resort to such extreme measures until all others had been exhausted and then only in a case of clear and hopeless insolvency. But here it must either be assumed that the defendant avoided the obvious and simple duty of calling a meeting of the board of directors, or that it was impossible to

procure one to be held. If it was impossible, then it must have been evident to the defendant that there was no hope for the resurrection of an insolvent bank whose directors could not be brought together for a meeting. We think that under such conditions it was as clearly the duty of the defendant to warn intending depositors or to make public announcement of the bank's insolvency as it would have been his duty to avoid these drastic measures in other circumstances. It is urged that the defendant has been punished for his diligence, and that the negligence of his fellow members of the board of directors is their passport to absolute freedom from liability. Like many other suggestions in this case, this has a taking sound, but, in our judgment, it will not stand the test of analysis. We are not now concerned with any alleged negligence of any other director. Nor is the judgment herein the defendant's penalty for his diligence. Had the knowledge which the defendant gained in making his investigation been properly used instead of being fraudulently concealed, the defendant would have received the commendation of the courts instead of condemnation. We regard this as a case of diligence misapplied and misused; of diligence apparently exerted for personal ends at the expense of official constancy. It is further urged on behalf of the defendant, that even if he may be charged with failure of duty in any of the particulars above indicated, he cannot be held guilty of fraud, because his acquiescence, if any, in the continuance of the business of the bank was only for a specified purpose under proper restrictions; that he did not agree that deposits should be unqualifiedly received, but only subject to the arrangement proposed by McDonald; that if the cashier, after having partially carried out the arrangement, chose to take orders from somebody else and receive deposits in the usual way, the defendant was powerless to prevent it and should not be held responsible. We cannot admit the soundness of this argument. It is superficially plausible, but it rests upon the false premise that there was no wrong in making some arrangement so long as the parties thereto considered it safe; and that

when once made, it could properly be treated as self-executing. So far as the plaintiff's assignors were concerned, the defendant's wrong began when he acquiesced and took part in the arrangement to receive deposits under any conditions except a full and fair disclosure of the bank's condition. As we have seen, the mere fact of taking deposits was an assurance to the depositors that the bank was solvent. Had they known it was insolvent they might well have declined to make any further deposits, even though they had been informed of the special arrangement under which deposits were to be received. But how are the depositors affected by the secret agreement made between the defendant and McDonald? As to them it was a nullity if they chose to treat it as such. Let us assume, however, that the agreement was of such a character that, if faithfully observed, it would have exculpated the defendant from the charge of fraud. Did the defendant's responsibility end with the mere making thereof? The very theory upon which the agreement is interposed as a shield to the defendant, is based upon the assumption that it was in the interests of honesty and would be faithfully carried out. Let us assume that the measure of defendant's duty was ordinary care. Did he exercise it? When the defendant was at the banking house on Monday evening a single question from him to the cashier or bookkeeper would have revealed the fact that the arrangement of Saturday night had been changed and all the deposits of Monday had been thrown into the assets of the bank. The record contains no such inquiry, and there was evidence from which the jury were at liberty to find that there was a reason for not making it. The sequel shows that the deposits were used for other purposes. A few favored depositors were taken care of as we shall presently ascertain.

We now turn to another phase of this case which has been previously mentioned but not discussed. That is the question whether the evidence was competent which relates to the checks in favor of the state treasurer, the East River Bridge Company and the Glen Ridge Mining and Quarry Co. In this connection it is to be remembered that there was evidence

of close relations between some of the officers of the bank and the state treasurer, and that the latter was present at the meeting held at the bank after it had closed its doors, and at which said checks were drawn. The defendant was president of the East River Bridge Co. and his brother was an officer of the Glen Ridge Mining and Quarry Co. The checks in favor of the state treasurer and said corporations were drawn at a meeting attended by the defendant and McDonald after the bank had closed its doors and suspended payment of its obligations. These checks amounted in the aggregate to $305,000.00. The visible cash assets of the bank on Saturday, August 5th, amounted to about $90,000.00. This was less than one-third of the amount required to pay the favored depositors. The charge against the defendant is fraud. Is there any connection between keeping the bank open during Monday and Tuesday and the payment of these checks? If there is, then the evidence objected to was competent as part of the *res gestæ*. That there is evidence from which the jury had the right to conclude that there is such a connection cannot be seriously doubted. Upon the facts proven it was competent for the jury to find that all the defendant's acts in connection with this bank, commencing with August 2nd, 1893, and ending with August 8th, 1893, were parts of a single transaction, the ultimate object and purpose of which was to secure these three favored depositors against loss, in the event that investigation should prove the bank to be insolvent. But, even if we indulge in the more agreeable assumption that the defendant inaugurated his investigation of the bank's affairs in good faith and without ulterior design, the evidence relating to these checks was still competent as bearing upon the motive or intent with which the defendant took part in keeping open the bank on Monday and Tuesday for the receipt of deposits. In this connection we should not forget that rules of evidence, like principles of law, must be applied to multifarious facts and conditions. In the case at bar we are dealing with fiduciary relations. The defendant was the director of an insolvent bank and the plaintiff's assignors were innocent depositors. The insolvency of the

bank made the directors trustees for its creditors. While courts should be careful to establish no rule that will impose upon bank directors harsh and unjust burdens, they should not be over nice in guarding them with the technicalities of evidence when charged with dishonesty or negligence in the performance of their official duties. Courts should remember that when men accept the honors which attach to such offices they also assume some duties to the stockholders and depositors whom they represent. In this age of banks and banking, confidence is the cornerstone of the whole business structure. Once let it be known that a bank director can be made liable for nothing that is not done by an organized board of directors, and confidence in banks will be put to a crucial test, and a dishonest director will never be at a loss for means of escape.

There are no other exceptions which seem to require specific mention or discussion, and we, therefore, conclude that the judgment of the Appellate Division should be affirmed, with costs.

Martin, J. (dissenting). It does seem to me that the prevailing opinion contains many assumptions and inferences that are unwarranted, and that unproved assertions, however ably or adroitly stated, ought not to supply the place of proof. It is impossible within the proper limits of this opinion to point out in detail all the instances where matters are stated as facts of which I find no proof, and conclusions are asserted not justified by or to be fairly inferred from the evidence in the record. In some instances there is mere extravagance of statement rather than total inaccuracy, still as to most of the essential elements of the case they may be said to be both. The former may be illustrated by the statements as to the character and extent of the defendant's knowledge of the insolvency of the bank; the latter by assertions that the defendant fraudulently concealed the condition of the bank; that his diligence was to carry out his personal ends at the expense of official constancy; that he procured the taking of

deposits for the benefit of favored depositors ; that there were close relations between some of the officers of the bank and the state treasurer, and others of a similar character. These statements are based upon the opinion as it stood when the case was decided.

By this action the plaintiff sought to recover the amount of several deposits made in the Madison Square Bank upon the seventh and eighth days of August, 1893. The persons who made them having assigned their claims to the plaintiff, this action was brought. The defendant was a director of the bank, but occupied no other position in or relation towards it except that of a stockholder and depositor. The bank was under the control and management of its president, cashier and other executive officers and employees, subject only to the supervision and control of the board of directors, which consisted of eleven members. The defendant stood in no contractual or personal relation with the plaintiff or his assignors. His only position as to the bank was that of an unpaid agent, with no powers except such as might be exercised as a member of the board of directors. Although the defendant with a majority of his associates might control the affairs of the bank, yet, as an individual director, he had no power or authority to dictate either as to its policy or the method of transacting its business. Such being the relation of the parties, and such being the only powers which the defendant could properly exercise, it seems manifest that he was not individually liable for the manner in which the business of the bank was transacted, unless some power to control its affairs was delegated to him by the board or unless he was shown to have been guilty of some act of usurpation which resulted in loss or injury to the plaintiff's assignors. That there was any delegation to him of power to control or manage the business or affairs of the bank cannot be even pretended. Nor was there proof of any act of usurpation upon his part which would justify a court or jury in finding that the affairs of the bank were directed, managed or controlled by him.

The relation between the bank and its depositors was that

of debtor and creditor. The acts of the officers of the bank to whom the power of management was delegated by the board of directors would render the bank responsible therefor to depositors if within the power delegated. If the officers transcended their authority in dealing with depositors, a right of action against them in favor of the depositors might exist. But an individual director would not be liable for the acts of such officers unless they were performed under his direction or under circumstances where he was responsible as principal for their acts as his agent. Although the relation which existed between the bank and its trustees was that of principal and agent, and the relation between the trustees and depositors has been said to be similar to that of trustee and *cestui que trust* (*Hun* v. *Cary*, 82 N. Y. 65), yet they are not trustees in any technical sense. (*Briggs* v. *Spaulding*, 141 U. S. 132, 147.) Ordinarily, that relation exists not between depositors and individual directors, but between the depositor and the board of directors as such. Certainly, where a power is conferred upon a body of directors, it cannot be properly said that each member individually and severally is to be regarded as a trustee for depositors when he has no authority to control the affairs of the bank, or to direct or restrain the act for which he is sought to be made responsible. We are aware of no principle upon which such a doctrine can be sustained. If each individual director were to be held responsible for the acts or defaults of the executive officers of a bank, of his co-directors, or even for his own honest mistakes or errors of judgment while acting in good faith in his capacity of director, it would put an end to all such offices, as none would be found who would accept them. In discussing the question of the liability of bank directors, Vice-Chancellor McCoun, in *Scott* v. *Depeyster* (1 Edw. Ch. 513, 541), said : " I know of no law which requires the president or directors of any monied institution to adopt a system of espionage in relation to their secretary or cashier or any subordinate agent, or to set a watch upon all their actions. \* \* \* But, without some fault on the part of the directors, amounting either to negli-

gence or fraud, they cannot be liable." In *Wakeman* v.
*Dalley* (51 N. Y. 27, 32) Judge EARL, in relation to a director,
observed : " He was simply a director, and as such attended
some of the meetings of the board of directors. As he was
a director, must we impute to him, for the purpose of charg-
ing him with fraud, a knowledge of all the affairs of the
company ? If the law requires this, then the position of a
director in any large corporation like a railroad, or banking,
or insurance company is one of constant peril. The affairs of
such a company are generally, of necessity, largely intrusted
to managing officers. The directors generally cannot know,
and have not the ability or knowledge requisite to learn, by
their own efforts, the true condition of the affairs of the com-
pany. They select agents in whom they have confidence and
largely trust to them. They publish their statements and
reports, relying upon the figures and facts furnished by such
agents ; and if the directors, when actually cognizant of no
fraud, are to be made liable in an action of fraud for any
error or misstatement in such statements and reports, then we
have a rule by which every director is made liable for any
fraud that may be committed upon the company in the
abstraction of its assets and diminution of its capital by any
of its agents, and he becomes substantially an insurer of their
fidelity. It has not been generally understood that such a
responsibility rested upon the directors of corporations, and I
know of no principle of law or rule of public policy which
requires that it should." A similar doctrine was held in
*Hallmark's Case* (L. R. [9 Ch. Div.] 329, 332) and in *Briggs* v.
*Spaulding* (*supra*), where the principle of these cases was
followed. We think the proof established no cause of action
in favor of the plaintiff against the defendant by reason of
the defendant's having been a director of the Madison Square
Bank and the plaintiff's assignors having been depositors
therein. Indeed, it is manifest that the plaintiff in bringing
this action recognized that fact, and, therefore, based his right
of recovery, not upon the relation between the parties of
director and depositors, not upon the ground of negligence,

34

but upon the sole ground that the defendant was guilty of fraud and deceit. Such was his complaint, and if its allegations were supported by the evidence, then he was entitled to recover and this judgment should be affirmed, but clearly not otherwise.

When we turn to the pleadings we find that the allegations of the complaint, so far as they relate to the defendant, were that he was a director of the Madison Square Bank; that he, with two other directors, constituted a committee having the charge, direction and management of the bank, and that he was an officer and agent and in actual control of said bank and managed and directed the affairs thereof; that with his knowledge and by his direction the bank was open for the regular transaction of business on August seventh and eighth, and that he then and there, for the purpose of inducing, and intending to induce, depositors to deposit their money in said bank, in violation of his duty and in violation of the statute, kept the bank open and directed, permitted and allowed it to be and remain open for the purpose of receiving deposits and for the regular transaction of business; that he then and there for that purpose represented to the depositors that the bank was solvent and could lawfully and properly accept deposits from such depositors; that such representation was false, and the defendant knew it to be false; that the bank was then hopelessly insolvent, and the defendant then knew that fact, and that the bank could not lawfully or properly accept such deposits. These allegations were denied by the answer, and thus were presented all and the only issues involved in this action.

While it was admitted that the defendant was a director there was no proof whatsoever that he was a member of any committee, or that he otherwise than as a member of the board of directors and in conjunction with a majority thereof had any charge, management or direction of the business of the bank, or that he was an officer or agent of it, or in actual control, or managed or directed its affairs. Nor was there any evidence that on August seventh and eighth the bank

was, by his direction or even with his knowledge, kept open
for the regular transaction of business, or that he for any pur-
pose kept said bank open, or directed or allowed it to remain
open for the purpose of receiving deposits or for the regular
transaction of business.   Nor is there any proof that he then
or at any other time, for any purpose or with any intention
whatever, represented to the depositors that the bank was
solvent and could lawfully and properly accept deposits.
Therefore, so far as any fraud upon the part of the defendant
is concerned, no liability can be based upon these allegations
of the complaint, because they are totally unsubstantiated by
the proof.   Indeed, such was the decision of the trial court,
and its instructions to the jury were as follows: "Now, as I
have said, the simple fact that he was a director does not
make him liable, but understand that the only way that he
can be made liable in this case is that he assumed to direct,
and that he did actually direct, the manner of receiving
deposits, and that he took part in the receipt of deposits either
by direction ; it is not necessary that he should have stood
directly behind the counter and received the deposits, but
that he took some part or control in receiving the deposits so
they got into the bank, and, as I said, if you find that is so,
together with the other fact that the bank was insolvent then
the plaintiff has made out his case.   *   *   *   Mr. Jenner:
I ask your Honor to charge that Mr. Uhlmann is not liable
in this action for any consequences of any negligence that
might be imputed to him in not taking care of the affairs of
the bank in his capacity as director.   The Court : I have sub-
stantially charged that, that he is only liable if he took part
in the receiving of the deposits made by these depositors,
knowing that the bank was insolvent, and whatever negli-
gence he may have been guilty of in caring for the assets of
the bank is not to be considered in this action."

Thus the only theory upon which the plaintiff was allowed
to recover was, that the defendant knew the bank was
insolvent and actually participated in directing the receipt of
deposits after he became possessed of that knowledge.   While

the proof of the defendant's statements was perhaps sufficient to justify the submission to the jury of the question whether the defendant knew that the bank was insolvent immediately anterior to the seventh or eighth of August, when the deposits of the plaintiff's assignors were made, still, there is no proof that he directed the receipt of deposits upon those days, or that he participated therein, or had any knowledge that such deposits were being received. The proof upon this question was that after examining the affairs of the bank, so far as was possible in the limited time he had, and in view of the confusion and complication of its affairs, and the uncertainty as to the value of its securities and assets, the defendant reached the tentative conclusion that the bank was insolvent or in a critical condition, and that upon ascertaining that fact both he and Mr. McDonald, who was another director, stated to the cashier, who was in charge of the bank, that it would not be right for it to receive deposits, owing to the showing made by statements furnished by the bookkeeper. After this statement as to the course that should be pursued, which was made in the presence of McDonald, and of Thompson who was also a director and the cashier, obviously ignoring or disregarding the suggestion of the defendant, McDonald inquired of Thompson what could be done, and then McDonald told him to take deposits on Monday in a specified method which insured protection to the depositors. But there was no proof that after having expressed the opinion that the bank should not receive further deposits, the defendant either withdrew his proposition or in any way acted upon or assented to the proposal of McDonald to receive deposits in the provisional manner suggested. Having expressed his views as to the course that should be pursued, obviously he was not required to contest the views of a co-director of equal authority, which were apparently concurred in by another, or be found guilty of fraud therefor, especially as the plan proposed would fully protect depositors. Therefore, as the theory upon which the case was tried and decided was that the defendant actually participated in the direction that deposits should be received

by the bank after it was insolvent, and as there was no evidence whatever to establish it, the judgment below cannot be properly sustained.

While the learned trial judge submitted to the jury two questions: 1. Whether the defendant knew at the time the deposits were made that the bank was insolvent; and, 2. Whether he took part in directing the receipt of deposits by the bank, knowing it was insolvent; still, as there was no evidence to sustain the latter finding, the court erred in thus submitting those questions to the jury. If we assume that the defendant knew of the insolvency of the bank or that it was in a critical condition, still, as there was no evidence that he took any part in directing the receipt of those deposits or that he had any knowledge that they were so received, it becomes manifest that the cause of action alleged was not sustained by the proof.

While a somewhat persistent effort was made to induce this court to hold that the jury had a right to infer from the proof and circumstances established that the defendant participated in directing or himself directed that the deposits of the plaintiff's assignors should be received after he became aware of the insolvency of the bank, yet any fair and unprejudiced reading of the record discloses that it is entirely barren of proof to justify any such inference. Therefore, as "insufficient evidence is no evidence," the verdict in that respect was without any proof to sustain it. But it is now sought to uphold the judgment upon the basis of a mere guess or conjecture which this court has repeatedly said can never be made the foundation by which the property of one person can be transferred to the possession and profit of another. As was said by CHURCH, Ch. J., to establish fraud "tangible facts must be proved, from which a legitimate inference of a fraudulent intent can be drawn. It is not enough to create a suspicion of wrong, nor should a jury be permitted to guess at the truth." (*Jaeger* v. *Kelley*, 52 N. Y. 274, 276.) That the burden of proof in this case was upon the plaintiff, who was bound to establish the fraud alleged; that such fraud was the

cause of the injury for which he seeks to recover, and that a
jury will not be permitted to base a verdict upon surmise,
upon mere food for speculation or to enter into the realm of
conjecture to find a verdict is sustained by a long line of
authorities in this court. (*Baulec* v. *N. Y. & H. R. R. Co.*,
59 N. Y. 356; *Pollock* v. *Pollock*, 71 N. Y. 137, 153;
*Cordell* v. *N. Y. C. & H. R. R. R. Co.*, 75 N. Y. 330;
*Dubois* v. *City of Kingston*, 102 N. Y. 219; *Bond* v. *Smith*,
113 N. Y. 378, 385; *Pauley* v. *S. G. & L. Co.*, 131 N. Y.
90, 98, 100; *Linkauf* v. *Lombard*, 137 N. Y. 417, 425;
*Hemmens* v. *Nelson*, 138 N. Y. 517; *People ex rel. Coyle* v.
*Martin*, 142 N. Y. 352; *Hudson* v. *R.*, *W. & O. R. R. Co.*, 145
N. Y. 408; *Cadwell* v. *Arnheim*, 152 N. Y. 182; *Hannigan* v.
*Lehigh & H. R. Ry. Co.*, 157 N. Y. 244; *Laidlaw* v. *Sage*,
158 N. Y. 73, 94; *Jefferson Co. Nat. Bk.* v. *Townley*, 159
N. Y. 490, 496; *Shotwell* v. *Dixon*, 163 N. Y. 43, 52; *Lopez*
v. *Campbell*, 163 N. Y. 340, 348.) In the *Baulec* case, Judge
ALLEN said that a scintilla of evidence, or a mere surmise
would not justify the judge in leaving a case to the jury. In
*Pollock* v. *Pollock*, Judge FOLGER said that insufficient evi-
dence in the eye of the law is no evidence, and then added
the language of MAULE, J., in *Jewell* v. *Parr* (13 C. B. 916):
"When we say that there is no evidence to go to a jury, we
do not mean literally none; but that there is none that ought
reasonably to satisfy a jury that the fact sought to be proved
is established." In the *Bond* case, EARL, J., said: "She
simply furnished them food for speculation, and that will not
do for the basis of a verdict. The law demands proof, and
not mere surmises." In the *Pauley* case, Judge FINCH said:
"A mere conjecture built upon a bare possibility will not
suffice to transfer the money or property of one man to the
possession and profit of another." In *Linkauf* v. *Lombard*,
Judge GRAY declared: "To permit a jury to speculate and
surmise upon a question of responsibility is to withdraw from
the litigant a safeguard intended for the protection of his
rights." The other cases cited are to the same effect.

Although a material fact may be established by circum-

stantial evidence yet, to do so the circumstances proved must
be such as lead fairly and reasonably to the conclusion to be
established, and must fairly and reasonably exclude any other
hypothesis. A party, to establish a cause of action based
upon fraud or wrongdoing, must show affirmatively facts and
circumstances which necessarily tend to establish a probability
thereof. It can only be established by proof of such circum-
stances as are irreconcilable with any other theory than the
guilt of the person charged. If the evidence is capable of
any interpretation which makes it equally as consistent with
innocence as with guilt, that meaning must be ascribed to it
which accords with innocence. "In order to prove a fact by
circumstances there should be positive proof of the facts from
which the inference or conclusion is to be drawn. The cir-
cumstances themselves must be shown and not left to rest in
conjecture, and when shown it must appear that the inference
sought is the only one which can fairly and reasonably be
drawn from these facts." (*Ruppert* v. *Brooklyn Heights R.
R. Co.,* 154 N. Y. 90, 94; *Shultz* v. *Hoagland,* 85 N. Y.
464; *Morris* v. *Talcott,* 96 N. Y. 100; *Baird* v. *Mayor, etc.,
of N. Y.,* 96 N. Y. 567; *Constant* v. *University of Roch-
ester,* 133 N. Y. 640; *Shotwell* v. *Dixon,* 163 N. Y. 43, 52;
*Lopez* v. *Campbell,* 163 N. Y. 340, 348.)

When the proof in this action is tested by the principles
established by the foregoing cases, it seems quite impossible
to properly hold that the evidence was sufficient to justify a
judgment against the defendant upon the ground that he
directed, or actually participated in any direction, that the
bank should receive the deposits, to recover which this action
is brought. The proof is that he affirmatively stated that
no deposits ought to be received, and that subsequently
another director devised a plan to receive deposits in a
manner which would protect the depositors until the condi-
tion of the bank could be more fully ascertained. The plan
suggested by the defendant was not accepted. Another
was devised in which he took no part, and there is no such
proof of his having assented thereto or participated therein

as would render him liable therefor. Moreover, as it is manifest that the plan thus proposed, and for a .time. adopted would, if carried out, have fully protected all subsequent depositors, it seems impossible, with any fairness or regard for law, to reach the conclusion that the defendant was guilty of fraud, even if he acquiesced in the plan suggested by McDonald. Here, for the first time, we find it seriously contended and held that where a party has obviously, in the utmost good faith and with an honest purpose, sought to pro- tect the interests of others by the adoption of a line of con- duct that would have completely accomplished that purpose, he may be adjudged guilty of fraud, because others, over whom he had no control, and for whose acts he was in no way responsible, may have thwarted his purpose and overruled his plans. It must be continually borne in mind that we are not dealing with any question of negligence or of contract, but only with the question of a fraud which the plaintiff contends rendered the defendant guilty of a crime. Hence, in deter- mining the question of the defendant's liability, it must be considered, in view of the principles of law relating to fraud, and with principles relating to questions of negligence or contract we have nothing whatever to do. The learned Appellate Division upheld the action of the trial court by assuming the sufficiency of the evidence to sustain the finding that the defendant directed the receipt of the deposits in question knowing the bank to be insolvent, which, as we have seen, was entirely unjustified by the evidence. Upon a simi- lar assumption the action of that court is now maintained by this. Since unproved assertions are not evidence, they ought not to be permitted to supply its place, however posi- tively or unqualifiedly made. As FINCH, J., said : " Calling names does not alter facts." The assumption is based upon statements as to the evidence, which, with the utmost dili- gence, we have been unable to verify by the record. The Appellate Division then proceeded to enunciate the doctrine that the defendant was liable for negligence in not carry- ing out the plan devised for the protection of the plaintiff's

assignors.  In concluding that he was negligent, it in no way
considered the defendant's lack of power or authority to carry
it out, nor that there was no evidence that he had any infor-
mation or knowledge that it was not being carried out in
compliance with the suggestion of his co-director.  The
cause of action, having been based on fraud, involving false
representations or fraudulent concealment, which can be
established only by proving the absence of good faith or
an honest purpose, and where an unlawful or fraudulent
intent is shown, which is distinct and widely different
from one founded upon negligence or upon contract, it
was not competent, upon appeal, for the Appellate Division
to make a substitution of either of the latter for the for-
mer.  Nor can this court properly make any such substi-
tution.  Where a case is based on fraud, the fraud must be
proved, and no relief can be given on any different ground.
(*Degraw* v. *Elmore*, 50 N. Y. 1; *Ross* v. *Mather*, 51 N. Y.
108; *Burnham* v. *Walkup*, 54 N. Y. 656; *Dudley* v. *Scran-
ton*, 57 N. Y. 424; *Barnes* v. *Quigley*, 59 N. Y. 265;
*McMichael* v. *Kilmer*, 76 N. Y. 36; *Salisbury* v. *Howe*, 87
N. Y. 128; *Truesdell* v. *Bourke*, 145 N. Y. 612.)  In the
*Ross* case it was held that in an action where fraud is the
basis of the complaint, a recovery cannot be had for a breach
of contract.  The *Burnham* case was decided upon the
authority of the *Ross* case, and involved the same question.
The *Dudley* case holds that a cause of action based upon
fraud, in the execution of a contract, is distinct from that
founded on a mistake merely, and it is not competent upon
the trial to make a substitution of one for the other.  In
*Barnes* v. *Quigley* it was decided that where the gravamen
of an action is fraud, the court cannot change its form and
allow a recovery as in contract, although facts may be stated
in the complaint by way of inducement which might sustain
such an action.  In the *McMichael* case it was held that
where a complaint is for fraud the action cannot be maintained
on the ground of mutual mistake.  *Salisbury* v. *Howe* was to
the effect that when the gravamen of an action as set forth in

the complaint is fraud, and the action is tried upon that theory without objection or exception, and the judgment is adverse to the plaintiff, the question whether the complaint stated facts sufficient to constitute a cause of action on contract, and whether there was evidence sufficient on the trial to sustain such cause of action, cannot be considered on appeal to this court. In the *Truesdell* case this court again asserted that where fraud is alleged as the basis of an action it must be proved, and that a recovery may not be had on proof of a right of action on contract or of some other character, although facts are proved which, in a proper form of action would justify a recovery.

As the proof discloses that the McDonald plan was abandoned, and fails to show that it was by the direction of the defendant, or that he was in any way connected therewith, the fact that it was not carried out tends to show, practically, that the defendant was unable to control the action of the officers of the bank as to the question whether such deposits should be received or not. As the plan suggested was ignored by the managing officers of the bank, it becomes quite evident not only that they did not, but that they would not have carried out the recommendations of the defendant if they had been in the form of a direction instead of a suggestion that the bank should be closed as to the receipt of deposits. Manifestly, the defendant as one of its eleven directors had no power to close the bank, as it was in charge of its executive officers of whom he was not one, and who were subject only to direction and dictation by the board. Powerless as such to close the bank, powerless to protect the depositors, powerless by his advice to secure their protection by others, and having done all in his power, he could do no more. What was he to do ? Was he required to step outside of his duties as a director and advertise the bank's insolvency, to stand upon the street corner or in front of the bank and proclaim his opinion as to its actual condition, while evidently not possessed of sufficient information to judge correctly or definitely as to its solvency ? We think not. If he had pursued the latter

course and it had ultimately transpired that the bank was solvent, as to which he might well then have been in doubt, he would surely have been liable to the bank or its stockholders for any damages that might have been sustained by reason of his action in that respect. Were the circumstances such as required him at his peril to perform an impossibility, or can he be held liable for fraud in not performing an act which he had no legal authority to perform? In other words, was he bound to incur the jeopardy of a course which might make him liable for many thousands of dollars by proclaiming, as a fact, a condition which could not be ascertained with certainty at that time? We think he was not required to accept any such alternative. When he had advised that the bank should accept no more deposits, although he raised no actual opposition to the plan of a co-director which would assure to the depositors full protection, we think his course of action can in no manner be tortured into a fraud on his part as against the plaintiff's assignors. To uphold the judgment in this case required the reversal or disregard of nearly every existing and well-established principle of law relating to actions for fraud or deceit and the rules of evidence controlling that class of actions. That fraud is not to be presumed, but must be proved, is a rule which has been so long and is so firmly established that the citation of authorities to sustain it seems needless. Yet, the attempt is to entirely disregard that principle and cast upon the defendant the burden of establishing his innocence as to the fraud charged, when there is no proof whatever to sustain it. This is sought to be done, not by openly overruling that principle, but by ingenious assertion and unwarranted argument to establish unproved facts and thus to avoid its force.

It is said that the defendant should have notified the superintendent of the banking department of the situation of the bank; the answer is there is no proof that he did not. As the bank was placed in the hands of an examiner on the ninth, it is evident that some one must have called the attention of the superintendent to its condition; and as there is no

proof who gave the information, it is quite as fair to presume that it was the defendant as to presume that it was some other person. Nor can it be fairly said that there was any such issue in this case. If the duty of notifying the superintendent rested upon the defendant, still, as this action was not based upon any neglect or omission of that duty, that question is not before us.

It is seriously argued that because the defendant, at the time of a severe panic, and when disaster seemed to be hovering over many of the great financial institutions of the city, sought to ascertain the situation of the bank of which he was a director and thus inform himself, so that he could act intelligently in the discharge of his duties as a member of the board as to any existing or prospective emergency, was evidence of an intended fraud upon his part. We think otherwise. It does not raise even a suspicion as to his good faith. When the fact that he was at the bank was followed by evidence which disclosed that, upon ascertaining as fully as possible the situation, he at once stated to the officer in charge that it would not be right to continue taking deposits, it becomes manifest that the fact of his examination and the course thereupon pursued by him not only failed to constitute fraud upon his part, but that it was no evidence even tending to show lack of good faith or intended fraud.

If there had been proof of the charges of the complaint that the defendant actually made any representations to the depositors as to the solvency of the bank that were untrue, quite a different question would be presented. Here the only pretended assertion of solvency was that implied from the fact that the bank was not closed. The bank was not kept open by the defendant, but by its officers alone. Every act performed by the defendant was in the direction of protecting the depositors, which he proposed to do by closing the bank. None of the cases cited by either counsel or court sustains a doctrine which justifies the judgment in this action. They all relate to conditions and situations radically unlike that developed by the evidence here. We are of the opinion that

the proof was insufficient to sustain a recovery against the defendant upon the ground of fraud, and that that being the only issue in the case the judgment cannot be sustained upon the theory of negligence or any other theory except that upon which the action was based.

On the trial the court permitted the plaintiff to prove that after the bank was closed and not reopened, the state treasurer drew a check for $250,000, which was paid through the clearing house by the St. Nicholas Bank, which cleared for the Madison Square Bank, and that deposits by the East River Bridge Company and the Glen Ridge Mining and Quarry Company were also withdrawn. This evidence was objected to and admitted under the defendant's objection and exception. While to sustain those rulings we again find that imaginary facts are stated which find no basis in the proof, still, we think it impossible to justify those rulings when considered in the light of the evidence actually given and of the principles of law applicable to those questions. The admission of proof of these transactions with the defendant had nothing whatever to do, except that with the bridge company, and none of which had any connection with or relation to the action or omission of the defendant for which the plaintiff sought to recover, was clearly erroneous and obviously tended to prejudice the jury against the defendant. There were several other rulings which cannot be sustained, sufficient to justify a reversal, but we prefer to place our opinion upon the grounds first considered.

We think the judgment should be reversed, and a new trial ordered, with costs to abide the event.

BARTLETT, VANN and CULLEN, JJ., concur with WERNER, J.; PARKER, Ch. J., and HAIGHT, J., concur with MARTIN, J.

Judgment affirmed.