STATE OF MINNESOTA *vs.* EUGENE LUCY.

June 17, 1889.

**Homicide — Opinion Evidence — Description of Sound.**—It is not erroneous to permit a properly qualified witness to express the opinion that a blow struck by the defendant upon the side of a house, just before the commencement of a quarrel, in the night-time, between said defendant and another person, in which the latter was killed, sounded like a blow struck with a piece of iron.

**Same — Death Caused by Blow from Third Person in Affray—Guilt of Defendant.**—Upon a separate trial of the appellant, who was jointly indicted with two of his brothers for the crime of murder in the second degree, the testimony tended to show that both of said brothers partici-

pated to some extent in the affray.. At appellant's request the court charged the jury that if the death was caused by a blow from a third person, who of his own volition interfered in the fight after it commenced, the defendant upon trial could not be convicted, and further charged, (the appellant excepting,) as a qualification to the foregoing, that if the jury should find that another'person struck the fatal blow, but that defendant upon trial aided, abetted, or assisted in the killing by word, act, or deed, he could be found guilty of the offence charged. *Held,* upon the record in the case, not to be error.

Same—Sufficiency of Evidence.—The testimony, as returned to this court, examined, and found to have fully sustained the verdict of the jury.

Appeal by defendant from a judgment of the district court for Otter Tail county, where the defendant was tried and convicted before *Searle,* J., and a jury, and was sentenced to imprisonment for life.

*Chas. C. Houpt* and *Thos. D. O'Brien,* for appellant.

*Moses E. Clapp,* Attorney General, and *Chas. L. Lewis,* for the State.

COLLINS, J. The defendant, Eugene Lucy, jointly indicted with his brothers, Daniel and Timothy, but separately tried, stands convicted of the crime of murder in the second degree, as charged in the indictment. From a judgment that he be imprisoned for life as punishment for the offence, he has appealed to this court, alleging error in a single ruling on the admission of testimony upon the trial; and that the court erred in its charge to the jury; and, generally, that it was error to refuse a new trial.

From the evidence it appears that James Gates, now deceased, met the defendants and several other persons at a dance given at the house of one of their neighbors. During the festivities Gates and the convicted defendant, Eugene Lucy, got into a discussion, in which the latter used abusive language towards Gates, and was finally ejected from the house by another man. Upon his return to the house within a few minutes, he renewed his abuse of Gates, and was again compelled to go out of the house. The deceased shortly afterwards went outside, where he met Lucy in the presence of several of the party, including the codefendants. It seems evident from the testimony that Lucy attempted—inside as well as outside

the house—to provoke the deceased into a fight, and it is equally as apparent that the latter endeavored to avoid it.    After some words, Lucy attacked Gates, striking at him, while Gates retreated several feet before returning the blows.    He then struck at Lucy two or three times, knocked him to the ground, and sat upon his body. Daniel Lucy immediately seized Gates by the shoulders, threw or rolled him over upon the ground, while the other brother, Timothy, rushed forward, and kicked at Gates, who in the struggle had fallen upon his back, with Eugene astride of him.    The latter then struck Gates one or more blows, and death resulted almost instantly; in fact, before Lucy could be pulled off from the prostrate body by one of the by-standers.    It cannot be doubted from the testimony that the defendant struck Gates one or more blows upon the head just before the latter died.    The defendant admitted upon his examination that he struck at him as he lay upon the ground, although he did not concede his blows to have been effectual.    The contention of the defence seems to have been, that these blows were with the bare hand, and could not have produced death at once; while the state charged in its indictment, and insisted upon the trial, that Lucy used an instrument of some unknown description upon the head of the deceased.

In detailing the affair one of the witnesses stated that when Lucy stepped outside the first time, he struck the house, causing a dull, hard sound.    As this entire occurrence was after dark, and none of the witnesses saw a weapon or instrument of any kind in the hands of the accused, the state, after laying the foundation for an opinion,—evidently for the purpose of showing by circumstances that Lucy was armed,—asked the witness if he could tell, by comparing the sound in question with that produced by the naked fist, what kind of a sound the blow made on the boards of the house; and he was permitted to answer, the defendant objecting.    The necessities of a case may frequently require the opinion of a witness to be given concerning matters with which he is specially acquainted, but which cannot be specifically described, and an opinion is always admissible whenever an effect produced upon the mind cannot be reproduced and made palpable to the jury.    For illustrations of this doctrine see Whart. Crim.

Ev. 459, 460; 7 Am. & Eng. Encyclop. Law, 496, and cases cited in note 2. In this instance it became essential for the witness to state the kind of noise or sound produced by the blow, and the best evidence attainable was offered. He had stated, without objection, that it was a dull, hard sound,—a conclusion based upon a comparison with other sounds; and we have no doubt but that when the witness went a step further, and compared it with the sound or noise produced by striking a solid body, like the side of a house, with a piece of iron, the jury had a much clearer idea of the sound in question than when the witness pronounced it dull and hard. The difference in sounds and noises is very easily perceived, but almost impossible to describe save by comparison.

In response to a request made by defendant's counsel, suggested undoubtedly by the testimony that Daniel and Timothy Lucy had to some extent participated in the quarrel, the court charged, in effect, that if death was caused by the blow of a third person, who of his own volition interfered in the fight after it commenced, the defendant upon trial could not be convicted. The court thereafter, and as qualifying this language, charged that if the jury should find that some other person struck the fatal blow, but that the defendant upon trial aided, abetted, or assisted in the killing by word, act, or deed, he might be found guilty as charged in the indictment. Of this the defendant complains, averring that there was no testimony whatever in the case tending to show him guilty of aiding, abetting, or assisting another person in the crime set forth in the indictment. We do not fully agree with counsel in all they claim in relation to the testimony on this point, but this exception to the charge is well disposed of by saying that the qualification was equally as pertinent and proper, in view of the testimony, as was the request to which it applied, and which induced it.

The defendant availed himself of a statutory privilege, and gave to the jury his version of the unfortunate encounter. In referring to this fact the court charged that such weight should be given his testimony as the jury believed it entitled to in view of all the facts and circumstances proved on the trial, and that the defendant's interest in the result of the prosecution might also be considered. This is

unquestionably the law applicable to the testimony of all witnesses, in civil or criminal cases, who have any interest whatsoever in the result of the litigation; and consequently there was no error in this portion of the charge.

Finally, it is claimed in behalf of the appellant that the testimony was insufficient to sustain a conviction. The physicians who made the *post mortem* examination—one being the coroner of the county— found a scalp wound about one inch long upon each side and upon the upper and back portion of the head of the deceased, which for their entire length penetrated to the skull. These physicians were very decidedly of the opinion that neither could have been produced with the naked fist. They were contused wounds, and, in the judgment of the medical men, inflicted by means of a blunt instrument, which must have been quite heavy, or used with great force. The skull was not found to be fractured, and there were no other injuries of the surface. The internal structure of the body was examined, and all of its parts and organs found to be in an apparently normal condition. Bruises were found upon the brain upon each side of the head and directly underneath the scalp wounds,—one being one and one-half inches in diameter. From these bruises or contusions the blood had effused and clotted in several places in the brain substance. In the opinion of these physicians death was caused by concussion and extravasation of the blood in the brain and its membranes,—the result of the blows upon the head. The defence attempted to destroy the effect of this opinion by introducing as witnesses four medical experts, who with great unanimity asserted the *post mortem* unsatisfactory and incomplete, because such organs as the heart and kidneys were not minutely dissected, without which, they asserted, it would be impossible to positively state the cause of the death. They also testified, as was admitted by the state, that concussion of the brain, followed by extravasation of blood in its substance and membranes, rarely resulted in instantaneous death. The object of this testimony seems to have been to lodge in the minds of the jurors a suspicion that, because instant death under circumstances like these is of rare occurrence, it might be attributed in this case to heart disease, which, it was claimed, cannot be detected with-

out a thorough and skilful dissection of the heart itself.    To create a reasonable doubt upon this vital point the opinions of two competent men in their profession, based upon an examination of the body of the deceased, and given after detailing the facts upon which such opinions were founded, were opposed by the opinions of four equally as competent men, we assume, of the same profession, who had not seen the subject, and who only knew of its appearance and condition from what was said by their professional brethren upon the witness stand.    Briefly stated, it was the opinion of four medical experts arrayed against that of two.    And this court is now beseeched to count the number upon either side for the purpose of reversing the determination of a jury, based unquestionably upon a careful and cautious weighing of the testimony.    The jury, composed, probably, of plain, practical men, with some knowledge of the effect of blows upon the head as well as the undoubted severity of those which produce concussion of the brain and extravasation of the blood in its substance, had listened to the particulars of an affray, in the night-time, which had terminated in the death of a healthy, vigorous man of the age of 28, almost immediately after injuries had been inflicted in the manner before related; had also been told of a movement of the accused, which tended to indicate that just before striking Gates he drew something from a pocket; and had also learned from the testimony that blood was seen to run from each side of the head of the dying man when the defendant was pulled from his body.    The jurors were justified in concluding that the blows were the direct result of something more serious than the bare hand; and were also fully warranted in rejecting the suggestion that death was caused by a disease which might have been discovered if the *post mortem* had been conducted with a view to accounting for such death in some other way than that which seemed to have been proved beyond a reasonable doubt.

Judgment affirmed.