## WEBB v. CASH, ET AL.*
### (No. 1239; October 26, 1926; 250 Pac. 1.)

BANKS AND BANKING—DIRECTORS' LIABILITY—KNOWLEDGE OF BANKS
CONDITION—EXCESSIVE LOANS.

1. If agreement under which bank became plaintiff's agent
to lend his money, for which he was to receive 8 per cent.
interest, was valid, bank would be liable for cashier's
negligence in lending such money, causing loss to plain-
tiff, but directors would not be personally liable, in ab-
sence of active participation in wrongful act.

2. Failure of state bank directors to know of condition of
bank is not an intentional or knowing violation of stat-
utes relating to state banks within Comp. St. 1920, §
5150, so as to make directors personally liable for loss
resulting therefrom, unless such failure arises out of de-
liberate or reckless conduct.

3. Whether bank directors' failure to know condition of bank
is such deliberate and reckless misconduct as makes them
liable for violation of Comp. St. 1920, § 5150, depends on
facts of particular case.

4. That at time of insolvency of state bank its reserve fund
was less than required by Comp. St. 1920, § 5142, does not
alone establish directors' personal liability under section
5150.

5. Where, when federal reserve banks refused to handle paper
indorsed without recourse, it became practice of state
banks to have excessive loans taken out in name of indi-
vidual, and by him indorsed and forwarded to its corre-
spondent, after being guaranteed by its directors, *held*
that such loans, even when sent back to bank when not
paid at maturity, should not be considered in determining
whether bank made excessive loans so as to make direc-
tors personally liable under Comp. St. 1920, § 5150, in
absence of evidence that practice was adopted to evade
statute.

6. Excessive loans to stock feed company, made to preserve
state bank's security by enabling company to furnish
feed to owners of live stock mortgaged to bank, and
which would otherwise have died, *held* not intentianally
made in violation of law so as to make bank directors
personally liable under Comp. St. 1920, § 5150.

7. Under Comp. St. 1920, §§ 5150, 5152, construed in pari materia, individual creditor of insolvent bank cannot enforce personal liability of directors under section 5150, where injury resulting from directors' negligence or misconduct is common to all creditors, but cause of action is exclusively in receiver; directors not being trustees for creditors.

*See Headnotes:   (1) 7 CJ p. 569 n. 4, 5 New; 14a CJ p. 177 n. 90, 91.   (2) 7 CJ p. 563 n. 24 New. (3) 7 CJ p. 563 n. 24 New. (4) 7 CJ p. 565 n.43 New. (5) 7 CJ p. 566 n. 47 New.   (6) 7 CJ p. 565 n. 43 New.   (7) 7 CJ p. 570 n. 8, 8 New; p. 793 n. 24; 14a CJ p. 169 n. 81, 88.

Appeal from District Court, Johnson County; Harry P. Ilsley, Judge.

Action by Adams Webb against J. J. Cash and others. Judgment for plaintiff, and defendants appeal.

*R. E. McNally* and *Burt Griggs*, for appellants.

The first question to determine is whether the action is one of deceit at common law, or for recovery upon a statutory liability provided by 5150 C. S.; the question arose in Bailey v. Mosher, 63 Fed. 489 (8th Cir.) where it was held that the action was based on a statute; our state banking laws are quite similar to the National Banking Act; where statutory violations are made the basis of recovery, a statutory remedy is exclusive; Yates v. Bank, 206 U. S. 158; Huff v. Bank, 173 Fed. 333; Bank v. Peters, 44 Fed. 13; Bank v. Crow, (Okla.) 111 Pac. 210. Respondent has attempted to allege a cause of action based on violations of the statutes relating to state banks, and is therefore restricted to the remedy provided by statute; Chesbrough v. Woodworth, 244 U. S. 72, 61 L. Ed. 1000. In order to recover, it was incumbent upon respondent to establish by a preponderance of evidence: (1) A collectible obligation. (2) Inability of bank to pay. (3) Amount of damages. (4) Insolvency due to violation of banking laws. (5) Appellants' assent to violations. Mason v. Moore, 73 O. S. 275, 76 N. W. 932. In this respondent

failed; a direct action by a depositor against directors is not maintainable; all depositors should be represented through a Receiver; 7 C. J. 793; Stone v. Cottman, (Mo.) 82 S. W. 76; Magee on Banks and Banking, (3d Ed.) 131-134. The liability of directors is an asset belonging to all creditors; 7 C. J. 792; Morse on Banks and Banking, Vol. 1, Sec. 129; Howe v. Barney, 45 Fed. 668. The case of Boyd v. Schneider, 131 Fed. 223, stands alone in holding that there was privity between depositors and directors; no such privity exists; Bank v. Peters, supra; Stephens v. Overstolz, 43 Fed. 771; Dawkins v. Mitchell, (La.) 90 So. 396. The bank must be made a party; Zinn v. Baxter, 65 O. S. 341; Ellis v. Co., (Miss.) 43 L. R. A. N. S. 982. The suit was prematurely brought; the damages cannot exceed the difference between the deposit and the value of the claim after the failure of the bank; 8 R. C. L. 438; 17 C. J. 753; directors' liability is a fund for all creditors; Horner v. Henning, 93 U. S. 228; McLaughlin v. O'Neil, 51 Pac. 243.

*Metz, Sackett* and *Metz,* for respondent.

The action is predicated on Section 5150 C. S.; bank directors are obligated to investigate and know the condition of their bank; Bank v. Johnson, 251 U. S. 68; Williams v. Brady, 221 Fed. 118. The statute involved in the case of Horner v. Henning differs from ours; a creditor may maintain the action; Bailey v. O'Neal, (Ark.) 122 S. W. 503; Patterson v. Co., (Minn.) 16 A. S. R. 671. The object of the statute is to make the officers of a bank liable to its creditors for neglect; Railroad Co. v. Pedrick, 222 Fed. 75. Receivership does not take away the creditors' right of action against directors; Patterson v. Co., supra; Foster v. Bank, 88 Fed. 604. The liability of directors is not secondary, as is the liability of shareholders under Section 3186; the directors are primarily, severally liable for injury caused by intentional wrong or wrongs committed under such circumstances that they are in ef-

fect intentional; Briggs v. Spaulding, 141 U. S. 132; Bank v. Johnson, supra; Williams v. Brady, supra; Boyd v. Schneider, 131 Fed. 223. A suit against directors, where the affairs of the bank are in liquidation, is not prematurely filed; Williams v. Brady, supra.

BLUME, Justice.

This is an action brought by the plaintiff against the defendants, who were the directors of the Powder River State Bank. Judgment was recovered against the defendants and from this judgment they appeal. The action is based upon an alleged violation of section 5150, W. C. S. 1920, and particularly for violating the law in making excessive loans. The parties will be referred to herein in the same manner as in the court below. A summary of the facts is as follows:

Adams Webb, the plaintiff in this case, deposited the sum of $10,000 in the Powder River State Bank of Kaycee, Wyoming, in the years 1917 and 1918, but he withdrew, sometime prior to August, 1920, the sum of $3500, leaving in the bank $6500, the amount in controversy in this case and for the recovery of which the defendants are sued in this case. According to the claim of plaintiff, he was an ordinary depositor in the bank. It was agreed, however, between him and J. J. Cash, the cashier of said bank, that he should receive interest thereon at the rate of eight per cent per annum. According to the testimony of Cash, the bank borrowed this sum of money from the plaintiff for the purpose of investing and reinvesting it for him from time to time. The money was taken out of the account of plaintiff and invested in loans made, and the note or notes representing the loan or loans were thereupon placed among the papers of the plaintiff. Cash himself ultimately became, or perhaps always was, the borrower of this money. Two loans, aggregating the sum of $6500, were represented by notes made by Cash himself, one for $5,000, made August 30, 1920, and one for $1500, made November

10, 1921, both of these notes being made to J. Elmer Brock, endorsed by the latter and placed among the private papers of plaintiff. These notes were renewals, as testified to by Cash, of notes made by him previously. The loan or loans so made for plaintiff were, however, shown on the books of the bank and as though made by it directly and then sold to plaintiff. The defendants, aside from Cash, testified that they had no knowledge whatever that the plaintiff had any money in the bank aforesaid, or that any loan whatever was made to Cash out of the money of the plaintiff. Cash himself testified that he did not know whether the plaintiff's money, or the loan or loans made for plaintiff, were ever mentioned by him to the Board of Directors. The plaintiff filed a claim with the receiver as an ordinary depositor, and the receiver allowed it as a general claim.

The Powder River State Bank, hereinafter frequently referred to simply as the bank, became insolvent and went into the hands of a receiver on February 2, 1922. It had, during the period in controversy in this case, a capital stock of $50,000 and a surplus of $50,000. A loan to any one party was, accordingly, under the statutes of this state, limited, in any event, to the sum of $20,000. It appears that the bank made numerous loans from time to time, generally secured by mortgages on live stock or land or both; that a number of customers of the bank, however, were in need of more money than the bank itself was able to loan. Arrangements were, accordingly, made—in accordance with a custom all over the United States—under which loans made to any one party in excess of the amount which the bank itself was authorized to loan, would be transferred to and held by correspondent-banks without recourse. After the organization of the Federal Reserve Banks, a ruling was made by these banks that they would not handle any commercial paper without recourse. This ruling, so the testimony shows, disarranged the system

theretofore in vogue among the banks of the country, and
the bankers in the reserve cities advised and instructed
the bankers in other places that thereafter loans in excess
of the power of a bank to carry, should be taken in the
name of an individual, by him endorsed and forwarded to
the correspondent-banks to be held and carried by the
latter, who, in turn, would be enabled to discount these
loans in. the Federal Reserve Banks. According to the
testimony, this practice was adopted and in vogue all over
the United States, with the approval of the Federal Re-
serve Banks. This method, in other words, was a method
adopted to take the place of the former method whereby
banks outside of the reserve cities sold loans to banks in
such cities without recourse. In the case at bar, most of
the loans of this character were taken in the name of J.
Elmer Brock, were by him endorsed and forwarded to and
bought by the correspondent-banks of the Powder River
State Bank. These correspondent-banks, however, ex-
acted from the directors of the Powder River State Bank
—and that, too, in accordance with a prevailing custom
in the country generally—additional security by means of
a so-called directors' guaranty; that is to say, the pay-
ment of the loans negotiated and sold to correspondent-
banks, was guaranteed by the members of the Board of
Directors of the Powder River State Bank. Under this
guarantee the defendant Young paid, after the failure
of the Powder River State Bank, the sum of approxi-
mately $136,000, and the defendant W. J. Thom surrend-
ered all of his property, but whether for the purpose of
liquidating part of the notes so guaranteed, or for the
purpose of liquidating other debts of the bank is not
shown.

Despite the fact, however, that the loans so negotiated
were not made to the bank in question here, it was the
custom, as testified to by Thom, for the correspondent-
banks to treat the bank in question here—and other banks

similarly situated—as responsible for the loans so sold and negotiated, and would, when any loan would become due, send the note or notes to the bank to be collected or renewed.    Under this practice the Powder River State Bank made many loans, the Omaha National Bank alone holding at one time about $100,000 of such paper.    The notes would be taken at ten per cent interest per annum, and were carried by the correspondent-banks at seven or eight per cent per annum, the Powder River State Bank receiving the benefit of the difference in the rates of interest.    The business so conducted was very profitable for a time.    Up to the year 1921, the correspondent-banks were anxious to hold and carry loans so sold to them, and no difficulty was experienced by the Powder River State Bank in negotiating all the loans that it was able to make. But some of the winters were severe; poison on the mountains killed many of the cattle on which the bank had security; a considerable slump in prices of cattle occurred in 1920, and commencing with 1921, according to the testimony, the correspondent banks insisted upon payment of the loans held by them, followed by a refusal to take any renewal notes or any new loans.    The notes, accordingly, previously sold to the correspondent banks, were sent back to the Powder River State Bank, and accumulated therein in the latter part of 1921.    But during October or November, 1921, a committee of the War Finance Corporation, which had been organized for the relief of banks, promised the defendants in this case and agreed to take the notes held by the Powder River State Bank, including those, or some of those, previously negotiated to correspondent-banks, in an amount of $200,000.    Efforts, accordingly, to dispose of any surplus paper in the Powder River State Bank, ceased, in accordance with the agreement so made.    But the promise was not kept, and the Powder River State Bank was, accordingly, compelled to go into the hands of a receiver.

These, in short outline, were the causes, as graphically told by the witnesses of the defendants, particularly the witness Thom, that led to the downfall of the bank in question here. But the plaintiff claims that, while these factors may have contributed to the failure of the bank, the primary cause thereof was due to the violation of the statute on the part of the directors of the bank, and the petition seeks to hold the defendants responsible for the payment of the amount due the plaintiff, on the theory first, that the directors of the bank failed to keep on hand the reserve required by law, and second, for participating in making loans made by the bank in excess of the amount permitted by law. To sustain the first allegation above mentioned, testimony was introduced to show the condition of the bank at the time that it went into the hands of a receiver. It then had on hand cash in only the sum of $1100, notes in the sum of $102,000, a great portion thereof uncollectible, stocks and bonds of the value of from $5,000 to $10,000, and some real estate and other property of undetermined value. The total claims filed against the receiver were approximately $280,000, of which $155,000 were for loans sold, in the manner hereinbefore mentioned, to correspondent-banks.

The excessive loans, for which the defendants are sought to be held responsible, are loans to L. A. Webb, J. J. Cash, and the Kaycee Manufacturing Company. No evidence was offered to show that any other loans were excessive. If we may accept the rather indefinite testimony of the receiver, the condition of the loan to L. A. Webb, was approximately as follows, on August 30, 1920: Total loan $78,200; sold thereof to correspondent banks, as above mentioned, $64,500, leaving the sum of $13,700 which was held by the Powder River State Bank. The condition of the Cash loan at that time was as follows: Total loan $94,500; sold thereof to others, as aforesaid, $75,500, leaving the sum of $19,000 held by the bank. The

loan of the Kaycee Manufacturing Company on that date was as follows: Total loan $39,000; sold thereof to others, as aforesaid, $20,000, leaving the amount held by the bank at $19,000. On January 4, 1921, a resolution was passed by the Board of Directors which, as testified, was a "stock" form required by correspondent-banks, in which, among other things, the Board of Directors ratified and approved any and all loans theretofore made by the officers of the bank. Presumably, the condition of the loans heretofore specifically mentioned was the same as on August 30, 1920. At least there is no testimony to the contrary. No change appears to have been made in the Webb loan, but the condition of the Cash loan, on November 10, 1921, appears to have been as follows: Total loan $88,700; disposed thereof to others in the manner aforesaid $35,000, leaving $53,700 then in the hands of the bank. The condition of the loan to the Kaycee Manufacturing Company on that date appears to have been as follows: Total loan $58,000; disposed thereof as aforesaid $33,000, leaving a balance held by the bank of $25,000. The increased amount from $19,000 to $53,700 held by the bank of the Cash loan would seem to have been entirely due to the fact that paper previously held by the correspondent-banks was sent back to the Powder River State Bank, and to the refusal of such correspondent-banks to hold or carry the amount previously held by them any longer. That was largely true also in conection with the loan to the Kaycee Manufacturing Company, but the difference of $19,000, held by the Powder River State Bank on August 30, 1920, and the sum of $25,000, held on November 10, 1921, seems to have been due to additional loans made to the company in the meantime. The additonal loans were larger than this difference, but $33,000, instead of $20,000—the amount shown on August 30, 1920—had been negotiated to other banks. The testimony shows that these additional loans were made to enable the Manufac-

turing Company to furnish feed to cattle during a severe winter, and that, had such additional loans not been made, all the cattle round Kaycee would have died. The defendant J. Elmer Brock, for instance, whose testimony appears to be uncontradicted, testified on this point as follows:

"Q. When was the Kaycee Manufacturing Company loan first made? A. Shortly after the company was organized. Q. Was this loan good at the time it was made? A. Yes, sir. Q. The loan was subsequently increased. Why was it increased? A. We carried a very small line of loans for the Kaycee Manufacturing Company until the hard winter. At that time they handled around $100,000 worth of feed and at some stages a great deal of that was in transit, so it was necessary to advance them considerable sums of money to order this feed, as the stockmen ordered it from them. Q. You say it was necessary. Why did the bank consider it necessary? A. To preserve their security. Q. Explain to the court why it was necessary for the bank—that you considered it necessary for the bank to advance them money. A. They had that stock and they had to have feed for it or the stock would die. Q. How was the bank interested in the stock? A. They had mortgages on it."

The testimony shows that the loans in question, when originally made, were not in excess of fifty per cent of the security given therefor. The defendants in the case, aside from Cash, testified directly and specifically that they never at any time authorized or approved any excessive loan on the part of the bank, but that on the contrary, whenever any loan appeared excessive—which, it seems, at times was true, because of the return of notes previously negotiated—it was promptly directed to be reduced to the legal limit. The main witness for the plaintiff in this case, who testified on the subject of excessive loans, was J. J. Cash, the cashier of the bank. It is well to give some

of his testimony in detail, inasmuch as the plaintiff's case is largely dependent thereon:

"Q. Did you at any time prior to the collapse of this bank, carry any excess loans and notes? A. Well, that is a kind of a hard thing to state outright. Might have been possible at one particular time. The paper was changing hands all of the time, and it might have been some particular times there might have been excess loans. Q. Will you say positively that you ever had an excess loan there prior to the time that the bank became insolvent, a short time previous to the insolvency? A. Well, I wouldn't want to state for sure, but it is possible that there were along towards the latter part. Q. Right before the insolvency? A. Yes. Q. What brought that about? How did that happen? A. On account of the paper we had sold that was coming back on us. Q. To your knowledge, Mr. Cash, did the Board of Directors ever, at any time, consent to an excess loan to any individual? * * * A. Well, the Board would probably have knowledge to a certain extent. These loans were in process of changing hands all of the time, and if when the Board met we did possess an excess loan, those were discussed by the Board and steps taken to remove it as far as possible, the excess loan, if we had it. Q. But do you remember of any incident, any occasion, where the Directors discussed or passed upon an excess loan? A. Well, whenever we found that, that was what our instructions were, you know, was to get from under that excess loan as quickly as possible. Q. Your instructions from the Board of Directors? A. Yes, and to use all of our ability and resources to do that, to remove that, which we did."

It appears that the members of the board attended the meeting of the Board of Directors reasonably diligently and no complaint is made on that account; that the board had a general supervision over the making of the loans of

any large amount; and that before any such loans were made by the cashier, at least some members of the board were consulted. A few additional facts will be mentioned later.

1. Much stress was laid in the trial of the case, though apparently not in this court, upon the relation of the plaintiff to the bank. In view of the fact that the plaintiff testified that he was to receive eight per cent interest per annum upon his money, a rate of interest much in excess of that paid to the ordinary depositor, it would seem that the testimony of Cash should be accepted that the bank became the agent, through Cash, for the purpose of loaning the plaintiff's money. And it would seem, further, that it is not unlikely that Cash loaned the money to himself, and that the other directors of the bank had no knowledge of the transaction between him and the plaintiff. It may be a question as to whether such agreement was valid, particularly in the absence of ratification thereof by the Board of Directors. See 1 Bolles Modern Law of Banking, p. 234, and particularly First National Bank v. Springfield, 40 Idaho 587, 235 Pac. 897, which deals to some extent with the particular points here discussed. But if the agreement was valid, and the bank was negligent in loaning out the money, it would doubtless be liable therefor and such negligence would be the proximate cause, or at least one of the proximate causes, of the loss to plaintiff. The directors, however, could not be held responsible therefor to plaintiff in the absence of active participancy in a positively wrongful act, intendedly operating injuriously to the plaintiff—in other words, unless the injury to plaintiff was occasioned by the malicious or fraudulent act of the directors, of which there is no evidence in this case, unless it be as to Cash himself. 14-A C. J. 177. As to whether or not, in view of these facts, the violations complained of herein could also be considered a proximate cause, that is to say, a concurring cause

of the injury and loss of plaintiff, is a point deserving of consideration. We shall leave it undecided, inasmuch as the receiver in this case allowed the claim of plaintiff as a general claim against the bank, and shall proceed to consider what we conceive to be the two important points in this case.

2. Plaintiff relies upon the violation of the provisions of section 5150, W. C. S. 1920, which reads as follows:

"If the directors of any banking association, which shall have availed itself of any of the provisions granted by this chapter, shall knowingly violate or knowingly permit any of the officers, agents or servants of said association to violate any of the provisions of this chapter, all the rights, privileges and franchises of the said association derived from this chapter shall thereby be forfeited. * * * And in case of such violation, every director, who participated in or assented to the same, shall be held liable in his personal and individual capacity for all damages which the association, its shareholders or any other persons, body politic or corporate, shall have sustained in consequence of such violation."

The section so quoted is almost identical with section 5239, Revised Statutes of the United States, which reads as follows:

"If the directors of any national banking association shall knowingly violate or knowingly permit any of the officers, agents or servants of the association to violate any of the provisions of this title, all of the rights, privileges and franchises of the association shall be thereby forfeited. * * * And in case of such violation, every director, who participated in or assented to the same, shall be held liable in his personal and individual capacity for all damages which the association, its shareholders or

any other person shall have sustained in consequence of such violation.''

Counsel for the parties herein agree that the rule of liability and duty of the defendants should be as interpreted by the Supreme Court of the United States under the provisions of the section last quoted. The point has been discussed by that court in several cases: Yates v. Jones National Bank, 206 U. S. 158, 51 L. Ed. 1002, 27 Sup. Ct. 638; Thomas v. Taylor, 224 U. S. 73, 56 L. Ed. 673, 32 Sup. Ct. 403; Jones National Bank v. Yates, 240 U. S. 541, 60 L. Ed. 788, 36 Sup. Ct. 429; Bowerman v. Hamner, 250 U. S. 504, 39 Sup. Ct. 549, 63 L. Ed. 1113; Corsicana National Bank v. Johnson, 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141. In the last of these cases the court mentioned excessive loans, but the principle would be applicable to other violations of the statute as well, and the rule of liability is therein summarized as follows:

''Under the rule settled by several decisions of this court, in order for the bank to prevail in this action, it must appear not only that the liabilities, of a person, company, firm etc. to the bank for money borrowed, were permitted to exceed the prescribed limit, but that the defendant, while a director, participated in or assented to the excessive loan or loans, not thru mere negligence but knowingly, and in effect intentionally, with this qualification: that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as in effect intentional.''

Counsel do not agree in construing or applying this rule, and it is claimed on behalf of the plaintiff that if it be conceded that the directors in this case did not know of the violations of the statute in this case, they should have known, and that their negligence in not knowing

constituted in effect an ''intentional'' violation. There is, of course, a difference between ''deliberate'' abstention from the performance of duty and mere negligence, though there may be a common-law liability for negligence as to acts not embraced in or contemplated by section 5150, supra. This difference is clearly pointed out by the Supreme Court of South Dakota in the case of Grandprey v. Bennett, 41 S. D. 619, 172 N. W. 514, where the court said:

''We therefore hold that the directors of national banks are liable for violations of the provisions of the federal statute only when such violations are committed with knowledge on the part of the violators that they are violating such provisions, but that there is ''in effect'' an intentional violation of such provisions whenever a director deliberately refuses to examine, or deliberately refuses to do any act which under such provisions it is his duty to perform; that there is no other statutory liability; that the common law liability for damages flowing from acts of directors, which acts are not among those named in the federal statute, is not in any manner affected by such statute.''

The court in the same case also holds that acts of negligence may be taken into consideration in determining whether there was in effect an intentional violation of the provisions of the statute, and that ''from such and other facts a jury might be justified in finding that a director had deliberately refused to examine that which it was his duty to examine.'' The court, however, did not hold that a deliberate refusal to examine matters may be gathered exclusively from mere acts of negligence. In Bailey v. Babcock, (D. C.) 241 Fed. 501, 508, the court said:

''The illegal acts charged against the defendant fall into two classes: First those which are claimed to be vio-

lations of the National Bank Act; and second, those which are alleged to constitute a breach of duty by the directors as agents of the bank, under the common law. It is entirely clear under the authorities that a different measure of liability must be applied in the two cases. In the former the duty imposed is that enjoined by the statute; and where a statute creates a duty and prescribes a penalty for non-performance, the rule provided in the statute is the exclusive test of liability."

And in the case of Bailey v. O'Neal, 92 Ark. 327, 122 S. W. 503, 135 A. S. R. 185, 188, the court, in construing statutes providing for liability for "intentional negligence," said:

"Sections 863 and 864 do not make the directors liable for a single act of negligence, however inconsequential; but they make them liable for a series of connected acts of negligence continued for such length of time as it must be inferred that their acts of negligence were intentional."

Even the phrase "gross negligence" would be inappropriately or unhappily used to express the test of liability under section 5150, supra, if we accept what is said in Hart v. Evanson, 14 N. D. 570, 105 N. W. 942, 3 L. R. A. N. S. 438, where the court said:

"It is urged that the appellant's conduct as a director was so grossly negligent that the law will infer willful fraud and intentional injury. The argument involves an absurdity. Negligence, whether slight, ordinary or gross, consists of the want of care, and implies the absence of intentional wrong doing."

In the case of Thomas v. Taylor, supra, the court said that not more than "recklessness" was required as a con-

dition for liability. In other words, it would seem that the United States Supreme Court would not consider failure to know the condition of the bank as an intentional violation of the statute, unless such failure arises out of deliberate or reckless conduct. And such construction would seem to be in consonance with the statute, for the specific provision thereof that no violation of the statute creates liability unless it is knowingly, that is to say, intentionally, done, cannot be nullified altogether. As to whether such deliberate or reckless conduct has been shown in a particular case must depend upon all the facts shown, and each case must be governed by its own circumstances.

Coming then to the consideration of the facts in this case in the light of the rule above mentioned, we fail to find any evidence in the record from which it may be gathered that the directors intentionally violated the provisions of section 5150, by keeping a reserve fund less than twenty per cent of its liabilities to depositors, as required by section 5142, W. C. S. 1920. The only testimony in the record upon which the claim of such liability could be based is the fact that the receiver found on hand cash in only the sum of $1100. When the reserve fund in the bank over that amount disappeared is not shown. The mere fact that at the time of the insolvency of the bank there was not on hand a sufficient reserve cannot alone show such liability, for the insolvency of a bank is generally, if not universally, brought about by reason of the insufficiency of its reserve fund, and the contention of counsel would lead to the result that in substantially every case the liability of the directors would follow as a matter of course whenever a bank becomes insolvent. We have been cited to no authority holding that to be the law, and we do not think that this was the intention of the statute.

No complaint is made, as heretofore stated, that the directors did not give reasonable attention to the affairs of the bank. They had general supervision over the making of loans and went over and criticised them at various meetings, directing the elimination of excessive loans, if any appeared. The loans as originally made are shown to have been in an amount approximately fifty per cent of the security offered. But poison on the mountains, a severe winter, drouth, and a terrible slump of prices, considerably reduced the security, and made some of the loans, in fact, nearly worthless. The loans to Cash and to Webb do not appear to have been in excess of the amount allowed by law, unless the loans that were negotiated must be considered as part thereof. In fact, counsel for plaintiff base their argument mainly upon such negotiated loans, claiming that because the correspondent-banks treated the Powder River State Bank as responsible therefor, and because this was done in accordance with the custom testified to by Mr. Thom, these negotiated loans should be treated as part of the loans held by the bank and therefore excessive; further, that the directors, having gone over the various loans from time to time, could not help but know of them. We have, however, not been cited to any authority holding that these negotiated loans, even when sent back to the bank, could be considered in determining whether the bank had excessive loans. They were not made to the bank, and were not endorsed by the bank. We need not determine whether it would make any difference if the method for negotiating the loans had been adopted for the purpose of evading the law. No such purpose appears. The method took the place of a preceding method under which the bank sold notes without recourse, and hence without any liability on its part. The correspondent-banks who bought the notes evidently relied, in the main, on the guaranty signed by the directors. We need not disagree with counsel for the plaintiff

that the method pursued was pregnant with danger. The. discounting of notes, particularly when done with recourse, while doubtless at times subserving a beneficial purpose, nevertheless has, perhaps, been the most fruitful source of the insolvency of banks, and we have no doubt that such discounting, whether done with recourse, or without recourse but under a guaranty of the directors—which weakens the security of the general creditors of the bank—should be kept in check and regulated by law. But that is a matter largely for the legislature, and not for the courts. We have found little authority on the legal phase now under discussion. In First National Bank v. Brenegan, 198 Iowa 453, 198 N. W. 659, 36 A. L. R. 548, the bank rediscounted notes without recourse, and the court assumes, rather than decides, that this method was legal. Paton, in his ''Digest'' page 1182, holds that loans cannot be considered as made in violation of law where they are immediately rediscounted without recourse. It would seem that this holding is correct. And we are at a loss to know how the loans sold in the case at bar in the manner heretofore mentioned can be held to be on a different footing. Particularly is this true under the circumstances of the case. It has been shown herein, as heretofore stated, that the method adopted by the bank in the case at bar was the method adopted by the banks over the country generally; that it was a universal practice and concurred in by the bank examiner in this state, who, under the law, makes a periodical examination of the affairs of the banks of the state and exercises a general supervisory jurisdiction over them. It is held that customs and usages of business should be taken into consideration in determining whether or not a director is liable for negligence. Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662; Bowerman v. Hamner, 250 U. S. 504, 39 Sup. Ct. 549, 63 L. Ed. 1113; Wheeler v. Loan & Sav. Bank, (C. C.) 75 Fed. 781. It would seem that

ordinarily at least, that should be true also in order to determine whether there has been an intentional violation of the statute.

The loan to the Kaycee Manufacturing Company, is, as heretofore pointed out, to some extent different from the other loans of which complaint is made, for there was in fact, it seems, at one time, an excessive loan to this company. We need not determine whether all the directors had knowledge of the fact. The testimony shows without contradiction, as stated before, that such loans were made for the purpose of preserving the security of the bank, and no bad faith in that respect appears from the evidence. The manufacturing company evidently was manufacturing, purchasing and furnishing feed for live stock in the community and was doubtless the only concern located in the community engaged in that business, and, if we credit the testimony, was used by the bank as the instrumentality through which the live stock in which the bank was interested was sought to be preserved. It was held in First National Bank v. National Exchange Bank, 92 U. S. 122, 23 L. Ed. 679, that while it is unlawful for a federal bank to deal in stocks, it may accept such stock in satisfaction of a doubtful debt. In Bailey v. Babcock, (D. C.) 241 Fed. 501, the court held that while a bank has no power to carry on a manufacturing business, it may, in some cases, further an enterprise for the purpose of enabling it ultimately to recover a debt owing it. In Cooper v. Hill, 94 Fed. 582, 36 C. C. A. 402, it is held that where a bank has lawfully acquired property in payment of a debt, it has implied authority to make reasonable repairs thereon for the purpose of putting it in salable condition, and that its directors cannot be held responsible for money so expended in good faith. In Hodges v. Bank, 130 S. C. 115, 125 S. E. 417, the court said that there are circumstances under which a bank may legally purchase the obligations of a debtor even though to do so would

increase the obligations of the debtor to the bank beyond
the limit fixed by law; that the test is, whether this is
done for the benefit of the bank or for the accommodation
of the borrower. In Wheeler v. L. & S. Bank, (C. C.) 75
Fed. 781, the court held that where a loan was made to a
leading merchant in the town, who was also a director of
the bank, the latter might, without its directors being re-
sponsible under their common-law liability, continue to
advance money to the merchant, in order to preserve his
credit, and permit him to continue in business with the
hope that he would finally be able to pay. Applying these
principles of law to the case in hand, and assuming as
correct the uncontradicted testimony in the case, we are
not satisfied that it has been established, or it is at least
doubtful, that the excessive loan to the Kaycee Manufac-
turing Company must be said to have been intentionally
made in violation of law so as to make the directors per-
sonally liable therefor.

3.   Whatever doubt, however, there may be on the
points heretofore considered, the question still arises as to
whether or not the plaintiff has shown any right in him-
self to bring this action, and particularly to bring it for
himself alone and for his own individual benefit without
regard to any other creditor of the bank, although he has
no better rights than any other creditor and his injury
has been sustained in common with all the others, for it is
clear that he seeks by this action to gain an advantage
over the other creditors of the bank, and seeks to appro-
priate the liability of the directors, if any, to the extent
of satisfying his claim, for himself; and that amount
might exhaust the ability of the directors to pay.   There
are cases which seem to sustain the right of plaintiff to
bring this action, and the subject has given rise to some
difference of opinion among the courts.   We are not now
dealing with an ordinary tort, for which an agent of a
corporation may be liable to a third party the same as the

corporation itself. Nor are we dealing with a case of deceit, as dealt with in Chesbrough v. Woodworth, 244 U. S. 72, 37 S. Ct. 579, 61 L. Ed. 1000, and similar cases considered in note to 6 L. R. A. N. S. 872, and to some extent in note to 45 L. R. A. N. S. 421. We are here dealing with a case of misconduct in violating statutory duties imposed upon them, by reason of which it is alleged the bank became insolvent. In fact the case is somewhat more confined, since the damages sought to be recovered are by a creditor of the bank who became such while the bank was perfectly solvent. In such case, at least, the right to sue for damages appears to be the same whether the misconduct, giving rise to an action therefor, consists of negligence or in a violation of provisions of a statute, unless, of course, the statute gives a right of action in the one case and not in the other. No difference in that respect in the two classes of cases has been pointed out, and the authorities seem to put them on the same footing, although the cases based on negligence appear to be more numerous than the cases based on violations of a statute.

In some of the cases it is held that directors are trustees not alone of the shareholders, but of the creditors of the corporation as well; that a trustee is liable for his misconduct in managing the affairs of his principal, and that accordingly directors of a corporation are directly liable to any creditor damaged by such misconduct. This is true, for instance, in Solomon v. Bates, 118 N. C. 311, 24 S. E. 478, 54 A. S. R. 725; Baxter v. Coughlin, 70 Minn. 1, 72 N. W. 797; Delano v. Case, 121 Ill. 247, 12 N. E. 676, 2 A. S. R. 81; (principle affirmed in Chicago Title & Trust Company v. Munday, 297 Ill. 555, 131 N. E. 103; Cassidy v. Uhlmann, 170 N. Y. 505, 63 N. E. 554, and Seale v. Baker, 70 Tex. 283, 8 A. S. R. 592, 7 S. W. 742, are sometimes said to hold the same, but these cases seem primarily to be based on the principle that the directors in these cases knowingly permitted representations of the condi-

tion of the bank to be made, by reason of which the plaintiffs respectively were damaged; in other words, that the directors were liable for deceit. See also note to 3 L. R. A. N. S. 438. But it is difficult to perceive upon what principle a director of a corporation can be considered a trustee of its creditors. He is selected by the shareholders, not by creditors; he has no contractual relation with the latter; he represents a distinct entity, the corporation, and his relations to its creditors is exactly the same as the agent of an individual bears to creditors of such individual, and it is not pretended that in the latter case the agent would be the trustee of the creditors of his principal. And we think that by the great weight of authority such trust relation is distinctly repudiated, when the corporation is a going concern. Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 925, 35 L. Ed. 662; Deaderick v. Bank, 100 Tenn. 457, 45 S. W. 786, and authorities cited; Killen v. Barnes, 106 Wisc. 546, 82 N. W. 536; Hart v. Evanson, 14 N. D. 570, 105 N. W. 942, 3 L. R. A. N. S. 438 and note; Frost Mfg. Co. v. Foster, 76 Ia. 535, 41 N. W. 212; 14-A C. J. 169. Hence, also, by the great weight of authority, it is held that the directors of a bank are liable only to the corporation, whose agents and trustees they are, for violation or neglect of their official duty, and that, accordingly, no action lies against them by an individual creditor, in the absence of a specific statute authorizing it, but that the right of action belongs to the corporation as such, or to its receiver, and must ordinarily be brought by it or him. Some of the cases deny such action to a creditor, on behalf of the corporation, even where the corporation itself or the receiver refuses to bring the action. Zinn v. Mendel, 9 W. Va. 580; U. S. Fidelity & G. Co. v. Sav. Bank, 154 Ia. 588, 134 N. W. 857, 45 L. R. A. N. S. 451; Winter v. Baker, 34 Howard Pr. 183; Bailey v. Mosher, 63 Fed. 488, 11 C. C. A. 304; Hornor v. Henning, 93 U. S. 228, 23 L. Ed. 879; Douglas v. Dawson, 190 N. C.

458, 130 S. E. 195; McTammany v. Day, 23 Idaho 95, 128 Pac. 563; Sav. Bank v. Caperton, 87 Ky. 306, 8 S. W. 885, 12 A. S. R. 488; Bank v. Peters, (C. C.) 44 Fed. 13; Creamery Package Mfg. Co. v. Willhite, 149 Ark. 576, 233 S. W. 710; Allen v. Cochran, 160 La. 425, 107 S. 292; Crandall v. Lincoln, 52 Conn. 73, 108, 52 Am. Rep. 560; Deaderick v. Bank, supra; Killen v. Barnes, supra; Hart v. Evanson, supra; Union Nat. Bank v. Hill, 148 Mo. 380, 49 S. W. 1012, 71 A. S. R. 615; Frost Mfg. Co. vs. Foster, supra; Fusz vs. Spaunhorst, 67 Mo. 256; Landis v. Sea Isle, 53 N. J. Eq. 654, 33 Atl. 964; 14-A C. J. 177; 7 C. J. 569, 570, 793; Morse on Banks and Banking, sec. 129; Bolles, Mod. L. of Banking, sec. 38; 3 R. C. L. 470; Fletcher, Corporations, sec. 2570. See also Zinn v. Baxter, 65 O. S. 341, 62 N. E. 327; Harris v. Cheetham, 180 N. Y. S. 106.

In the case of Zinn v. Mendel, supra, it was held that a creditor of a bank cannot generally maintain an action at law against the directors thereof for simple nonfeasance of duty to the corporation, or fraud in the management or disposition of the money or property of the corporation. The court said in part:

"Upon consideration it seems to me that, if actions for the cause stated * * * were sustained by the courts of law, it would be highly detrimental to the public interest, and not conducive to justice. Thoughtless impulse and passions, might for a time justify it, but sober, sound thought and reason must and will condemn it; if not at once, surely in a reasonable time. Banking institutions, and other corporations, are essential to the welfare and prosperity of the country, and these institutions cannot generally be operated, save through the agency of directors, and if the directors of such institutions were held liable at law to the creditors thereof in damages for every act and negligence in the management and disposition of the moneys and property of the corporation, of which the corporation might lawfully complain, responsible men

could not be found who would take upon themselves the perils and dangers of the position. Such a result would be most disastrous in its consequences, and should be avoided, unless its avoidance is not allowed by the common law or some statute.''

In Fusz v. Spaunhorst, 67 Mo. 256, the court said:

''Aside from statutory provisions or one of similar nature in the organic law, the directors or officers of an incorporated bank would not be individually responsible in an action at law, for injury resulting to a creditor or depositor, unless the injury were occasioned by the malicious, or fraudulent act of the party complained of. Mere nonfeasance will not answer; nothing short of active participancy in a positively wrongful act intendedly and directly operating injuriously to the prejudice of the party complaining will give origin to individual liability.''

In the case of Winter v. Baker, 34 Howard Pr. 183, the syllabus is as follows:

''A creditor of a foreign corporation cannot maintain an action in this state against the directors of a corporation for willful and fraudulent mismanagement of its affairs, whereby the property of the corporation was wholly wasted, lost and embezzled, and the corporation rendered wholly insolvent, and the plaintiff's claims against the corporation rendered wholly worthless.''

The court said in part:

''But more especially applicable to these cases is the rule well established, that a stockholder cannot sue directors for damages, on the ground their stock was made valueless by the misconduct of the defendant. If a stockholder cannot maintain such an action, a creditor certainly cannot do so.''

In Crandal v. Lincoln, 52 Conn. 73, 52 Am. Rep. 560, an action in equity, the court held that the right, in actions like that at bar, is in the receiver, saying in part:

"To allow creditors to bring suits in such cases, unless possibly under peculiar circumstances, if practicable, would be highly inconvenient and contrary to the policy of the statute."

And what is said in Allen v. Curtis, 26 Conn. 456, though an action by a stockholder, is applicable here.  The court said in part:

"The general rule of law is, that an action at law must be brought by the person having the title, or right, to the thing demanded, or to the damages which are sought to be recovered for the injury.  Hence the Woodbury Bank should have brought this suit.  It is its property which has been misappropriated and lost, and the damages to be recovered belong to it, to be sure, in trust for bill holders, depositors and other creditors, if any there be, and finally for the stockholders, but for all of them, and not for some of them exclusively."

So in Abbott v. Merriam, 8 Cush. 588, also an action by a stockholder, the court said:

"They (the plaintiffs) have no right, by any direct suit, legal or equitable, to call directors, or other officers of the corporation, to an account for mismanagement.  *  *  *  The directors, and other officers, and agents are amenable only to the corporation, and to give every individual stockholder a right of action would lead to a multiplicity of suits."

And in Smith v. Hurd, 12 Metc. (Mass.) 371, 46 Am. Sec. 690, an action by a stockholder, the court said:

"If an action can be brought by one stockholder, it may be brought by the holder of a single share; so that for one and the same default of these directors, 3500 actions may be brought."

In the case of Creamery Package Co. v. Willhite, 149 Ark. 576, 233 S. W. 710, the court called attention to the requirements of the banking act which provides that the receiver of a bank shall collect all debts and wind up the corporation, similar to the provisions of section 5152, W. C. S. 1920, and held that the petition failed to state a cause of action in a suit against the directors for mismanagement, without alleging that the receiver (commissioner) had been requested to sue and had failed to do so. The court said in part:

"We think, however, that appellees are correct in their second contention that appellants do not state facts in their complaint entitling them to maintain their suit. The allegations of the complaint are that appellants have lost the aggregate sum of $23,000. But they are not the only losers. * * * It thus appears from the allegations of the complaint that the losses sustained by these appellants constitute a comparatively small part of the losses for which the directors are said to be liable. Yet it appears that the purpose of the suit by the three depositors who have brought it, is to apply to the discharge and satisfaction of the bank's indebtedness to them, the liability of the directors for the negligent mismanagement of the bank's affairs, and this without any allegation that the commissioner had been requested to sue and had failed to do so. This they cannot do. 4 Fletcher's Encyclopedia of Corporations, sec. 2570 and authorities cited."

So under similar statutory provisions in North Carolina, the court in Douglas v. Dawson, 190 Car. 458, 130 S. E. 195, states that rights of action like that in the case at bar belong to the receiver, the court saying in part:

"The manifest purpose of those statutory provisions is to secure a just and equitable disposition of all the assets of the corporation, upon its dissolution, among all who have claims upon or interests in said assets, in accordance with the respective priorities. To accomplish this just purpose and to bring about this equitable result, upon an involuntary dissolution, the title to all the assets of the corporation, under the statute, passes to and vests in the receiver, immediately upon his appointment. * * * Actions to recover such assets must be brought and prosecuted by the receiver, in his name, as representing all the creditors as well as the corporation. * * * Sums which may be recovered by stockholders, directors or officers as damages for negligence in the performance of duties which they owe to the bank, are likewise assets of the bank. The cause of action for the recovery of such sums upon the insolvency of the bank, vests in the receiver as the representative of all its creditors, depositors or stockholders. The action must, therefore, be brought by the receiver, or if brought by creditors, depositors or stockholders, they must allege that the receiver, upon demand, has refused or failed and neglected to institute the action."

Some of the cases above mentioned, apparently passed only upon the point that an action at law could not be maintained by a creditor under facts similar to those in the case at bar. In this state the distinction between actions at law and in equity has been abolished, and the principle which we have mentioned is applicable alike to either form of action, because it is based upon the fundamental proposition that the right of action belongs to the corporation or the receiver thereof, and is a right in which

all creditors are interested alike. Crandall v. Lincoln, 52 Conn. 73, 52 Am. Rep. 560. It is said in note to 45 L. R. A. N. S. 422:

"A general rule that a suit in equity can be maintained only where the creditor or creditors suing have suffered an injury not common to other creditors might be deduced from the holding in the various cases on the subject."

Plaintiff, however, claims that in this case the statute expressly authorizes him to bring this action for his own benefit alone, and he relies upon the provisions of section 5150, supra, providing that "in case of such violation every director who participated in or assented to the same shall be held liable  *  *  *  for all damages which the association, its shareholders or any other person  *  *  * shall have sustained in consequence of such violation." But the decisions are clear, as already seen, that in an action like that at bar, where a plaintiff has not sustained any injury except such as he has sustained in common with all other creditors, the right of action belongs to the corporation itself, or to its receiver. This is contemplated in section 5152, W. C. S. 1920, which provides that a receiver of a bank shall take charge of all the property of the bank, and of all of its effects and assets, and make distribution thereof to the creditors and shareholders. That section and section 5150, supra, must be construed in pari materia, and inasmuch as it is equitable that all creditors should, in a case like that at bar, be treated alike, the right of the plaintiff herein to sue under section 5150, notwithstanding the apparently exclusive right to sue granted to a receiver under section 5152, supra, should be clear. We do not think that it is; and it would seem that the right to sue granted to an individual creditor under section 5150, must generally be confined to that class of cases where his injury is distinct from and not in common with that of all the other creditors, as, for in-

stance, where he buys stock in a corporation upon reliance of the fraudulent representations of directors. Thus construed, the provisions in sections 5150 and 5152 are in harmony and may both be enforced, but that would not be true otherwise. In the case of Bailey v. Mosher, 63 Fed. 488, 11 C. C. A. 304, the court, in construing section 5239, Revised Statutes of the United States heretofore quoted, said on the point now under consideration:

"The petition shows that the bank, of which the defendants are officers and directors, is insolvent and has passed into the hands of a receiver. * * * The liability of the defendant, whatever it may be * * * is an asset of the bank, belonging equally to all the creditors in proportion to their respective claims, and cannot be appropriated in whole or in part by a single creditor to the exclusive payment of his own claim. It is the policy of the national banking act to secure the rightful distribution of the assets of an insolvent national bank among all its creditors. * * * The law will not allow one creditor to appropriate the whole liability of the directors to his own benefit * * *."

In Hornor v. Henning, 93 U. S. 228, 23 L. Ed. 879, the court considered the liability of directors, arising under the provision of a statute reading as follows:

"If the indebtedness of any company, organized under this act, shall at any time exceed the amount of its capital stock, the trustees of such company assenting thereto shall be personally and individually liable for such excess to the creditors of the company."

The court said:

"Nor can we believe that an action, intended for the benefit of the creditors generally, when the bank proves

insolvent, can be justly construed in such a manner that any one creditor can appropriate the whole or any part of this liability of the trustees to his own benefit, to the possible exclusion of all or any part of the creditors, but such may, and probably would often be the result, if any one creditor could sue alone, while there were others unsecured. We are of opinion that the fair and reasonable construction is * * * that this liability constitutes a fund for the benefit of all the creditors who are entitled to share in it in proportion to the amount of their debts, so far as may be necessary to pay these debts. * * * This course avoids the injustice of many suits against defendants for the same liability and the greater injustice of permitting one creditor to absorb all or a very unequal portion of the sums for which the trustees are liable.''

These cases are, we think, conclusive herein, and fully establish that plaintiff has shown no right in himself to bring this action. His counsel have cited the case of Patterson v. Minnesota Mfg. Co., 41 Minn. 64, 42 N. W. 926, 4 L. R. A. 745, 16 A. S. R. 671. But the statute construed in that case is readily distinguishable from the statutes involved in the case at bar. In the late case of Frederick v. McRae, 157 (Minn.) 366, 196 N. W. 270, it is held that the only action which a creditor has against directors is one for deceit; that where a bank is in the hands of a receiver, he alone has the right to recover the assets of the bank, and that he alone can maintain an action against the directors for declaring a dividend in violation of the statute. Counsel for plaintiff also rely upon the case of Bailey v. O'Neal, 92 Ark. 327, 122 S. W. 503, 135 A. S. 185; but the statutes construed in that case, too, are distinguishable from the statutes involved in this case, and, as we have already said, the Supreme Court of that state in the late case of Creamery Package Co. v. Willhite, supra, from which we have quoted above, seems to be in harmony with the views herein expressed by us. Boyd v.

Schneider, 131 Fed. 223, 65 C. C. A. 209, and Foster v. Bank, (C. C.) 88 Fed. 604, can hardly be said to sustain plaintiff's contention for the reason that in these cases the action was brought in behalf of all the creditors. Some expressions in these cases indicate that the courts regarded directors as trustees for creditors, a theory which is not correct. Pennsylvania R. Co. v. Pedrick, (D. C.) 222 Fed. 75, too, is distinguishable from the case at bar. In that case the court construed a statute which gave a right of action for misconduct of directors to all persons for the damages which "they may *respectively* sustain," and the court thought that in view of the use of the word "respectively" the statute intended to give a several cause of action to any person so sustaining damages. The case of Stephens v. Overstolz, (C. C.) 43 Fed. 465, is, we think, on the whole, in harmony with our view.

The judgment of the trial court herein is accordingly reversed, and the cause is remanded with directions to dismiss the plaintiff's petition.

*Reversed and Remanded.*

Potter, C. J., and Kimball, J., concur.